774 So.2d 649 (2000)
Curtis W. BEASLEY, Appellant,
v.
STATE of Florida, Appellee.
No. SC93310.
Supreme Court of Florida.
October 26, 2000.
Rehearing Denied December 21, 2000.
*652 Robert A. Norgard, Bartow, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, Florida, for Appellee.
*653 PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Curtis Wilkie Beasley for the 1995 murder of Carolyn Monfort. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For reasons which follow, we affirm Beasley's convictions and sentence of death.

MATERIAL FACTS
On August 24, 1995, Jane O'Toole, who had not heard from her mother, Mrs. Monfort, for two days, traveled to her mother's home in Dundee, Florida, to make sure that she was alright. Several morning newspapers lay in their wrappers outside the house. While searching through the home, Jane found her mother's body in the blood-stained laundry room. Mrs. Monfort had been severely beaten and was dead.
The last time that Jane spoke to her mother was on August 21, 1995. On that day, Mrs. Monfort, who worked in real estate, had dressed in business clothes in anticipation of her Monday morning meeting. The defendant, Curtis Beasley ("Beasley"), was there, dressed for work. Mrs. Monfort knew Beasley through her daughter's former husband, with whom Beasley had attended high school. Beasley was staying at Mrs. Monfort's house for a few days, while doing some pressure washing and painting at the Lake Marie Apartments (the "apartments"). The apartments were owned by Mrs. Monfort's son-in-law, Neal O'Toole (Jane's husband), and managed by Mrs. Monfort.
Before moving into the Monfort home, Beasley had been living at Steve Benson's house. Approximately one or two months earlier, Beasley had borrowed $600 from Dale Robinson, a friend with whom he had previously resided, to place his old van back into operation to commute to and from the painting job. At this time, however, Beasley had no transportation of his own. For this reason, he had recently been staying as a guest in the Monfort home, so that Mrs. Monfort could drive Beasley to and from work at the apartments. Dale Robinson had the impression that Beasley spent the night at Mrs. Monfort's house and remained at Benson's home during the day. In fact, on Sunday, August 20, Officer Pierson (a witness at trial) saw Beasley at Steve Benson's house, wearing a checkered "western-style" shirt during the day. However, Beasley apparently spent the night of the 20th at the Monfort home, because he was there at 8 a.m. the next morning, when the housekeeper, Mrs. Ferguson, came to clean the house. While cleaning that day, the housekeeper saw a checkered shirt lying on a wicker chest at the foot of the bed in the guest bedroom, which Beasley was using.
Later on the 21st, Jane called her mother and arranged for Beasley to help Jane move some of her grandmother's furniture. Mrs. Monfort had transported Beasley to work at the apartments at about 8:20 a.m. that day, and he returned to the Monfort home sometime in the late morning, after the housekeeper had left for the day. Jane picked Beasley up before noon (he was by himself at the Monfort home at that time), and he helped her move the furniture. In the process of this furniture move, Beasley told Jane that he would be in Alabama the following week to take care of an inheritance. He also asked Jane for some money. She replied that she had only a few dollars with her, but that her husband would pay him (for pressure washing the apartments) later. After the work had been completed, Jane drove Beasley back to the Monfort home around noon. Again, no one else was at home at that time.
The evidence demonstrated that, until 7:01 p.m. on the evening of August 21, phone calls were being made from the Monfort residence. These phone calls, including some to the United Kingdom, were made to people Beasley knew, but Mrs. Monfort did not know. A newspaper lying *654 on the coffee table in Mrs. Monfort's living room had one of those telephone numbers written on it in Beasley's handwriting.
The evidence established that, after Mrs. Monfort had transported Beasley to the apartments on the 21st, she went to her business meeting at 9 a.m. Later that day, she met with Mr. Rosario, a prospective tenant at the apartments, at 2 p.m. At 5 p.m., she again met with Mr. Rosario at the apartments. He gave her a deposit (first and last month's rent) in the form of eight $100 bills, and another $100 for a bedroom set which Mrs. Monfort sold to him. She wrote a receipt for the money, a copy of which appeared in the receipt book later found in her car. She left the apartments sometime between 5:30 and 5:45 p.m. That was the last time Mrs. Monfort was seen until the discovery of her body on August 24.
It was Mrs. Monfort's habit, between 6 and 8 p.m. on week days, to prepare and consume one or two drinks before dinner. These would always contain vodka and tonic, with either a lime twist or a lemon twist. When Mrs. Monfort's body was discovered, a drinking glass with a lime twist was found at her feet. Two empty tonic water bottles were in the kitchen garbage can, which the housekeeper had emptied earlier in the day. There were no other signs of food preparation in the house.
Sometime between 8:30 and 10 p.m. that night, Beasley drove Mrs. Monfort's car to Haines City to visit Dale Robinson. At that time, Beasley was driving a light-colored car (either white or blue), which he told Robinson belonged to a lady friend Beasley was working for, and at whose house he had stayed a few nights. During the visit, Beasley showed Robinson a $100 bill, offering it in partial payment of his debt. After Robinson suggested to Beasley that the money should be used to purchase some crack cocaine for them to smoke, Beasley left Robinson's house and did not return.
The next day, Beasley arrived at a bus station in Miami. He no longer had Mrs. Monfort's car with him,[1] and, at this point, he called the Malcolms, whom he had not contacted in over three and a half years. Although Beasley was known to Mrs. Malcolm to be a "snappy" dresser, when he arrived in Miami, he was wearing clothes that he said were "new" which looked odd togethera pair of dress shoes, a pair of jeans with no belt, and a brightly colored t-shirt. Beasley claimed to have lost his wallet, his traveler's checks, and all of his clothes on the bus. He told Mrs. Malcolm that he was vacationing in Miami after having visited unidentified friends in Fort Myers. He stayed with Mrs. Malcolm for a few days, then was permitted to stay at the house of Mr. Malcolm's mother (Mrs. Bennis) while she was away for two weeks. During this time, phone calls began to appear on Mrs. Bennis's bill to some of the same numbers (including calls to the United Kingdom) that had appeared on Mrs. Monfort's bill on August 21. The phone numbers belonged to persons known to Beasley but not to Mrs. Bennis.
During this period of time, Mrs. Monfort's body was discovered. She had been *655 bludgeoned to death with a blunt instrument. Near her body was a bloody hammer head, wrapped in two dish towels. The head of the hammer protruded through the fabric of one towel. The hammer head had been broken off of its handle, which also lay near the body. Mrs. Monfort had some hairs[2] in her right hand. There was blood on the floor, blood splattered everywhere in the laundry room, blood splattered in the dining room near the laundry room door, and some apparent blood smeared on the laundry room door frame. An earring was found in the dining room, lying next to a table leg. Mrs. Monfort's purse was near her feet, and she was dressed in the same business clothes she had worn to work on the morning of August 21.
The medical examiner who conducted Mrs. Monfort's autopsy testified as to the injuries observed upon examination. Mrs. Monfort had been struck with a blunt object, sustaining injuries on her face and head and typical defensive injuries to the backs of both hands (bruises and abrasions), on the back of the upper arms, and on the back of the left forearm (bruises). The left half of Mrs. Monfort's face was severely injured. There was a large laceration (10 inches by ¾ inch) extending from almost the top of her head down to her mouth. There was a large bruise on the left half of her face, and multiple lacerations in front of her left ear, on her left cheek, and in the area behind her left ear. There were bruises on both eyes and over her right cheek, and lacerations on the right half of her forehead. All of these injuries were inflicted antemortem. There was also a fracture of her cheekbone ("zygoma"), and a fracture of her left upper jaw (left "maxilla"). These were open fractures, well seen through the laceration on her face.
The lacerations on her face and head ranged in size from ¾ by ¼ inch up to 10 inches by ¾ inch. There were about nine lacerations on the left side of her head and face; two more lacerations of the right aspect of her forehead; four lacerations on the back of her head, and two others behind her left ear. This made a total of fifteen to seventeen lacerations on (or blows to) Mrs. Monfort's face and head, not including those consistent with being defensive lacerations.
There was also a depressed fracture of the left temporal (skull) bone having the shape of a figure eight; each half of the shape was 1¾ inches in diameter, and consistent with being imposed with the round part of a hammer. Mrs. Monfort's brain was lacerated from small fragment formation in the fracture area. There were subdural subarachnoid hemorrhages under the membrane that covered the brain (contusion hemorrhages into the superficial part of the brain, or the cortex). The cause of death, in the medical examiner's opinion, was blunt trauma to the head; while a hammer could have caused the injuries, the impact pattern did not suggest whether the head or the claw end had been used.
After Mrs. Monfort's body was discovered, an investigation of the crime scene was conducted. The only rooms which appeared to have been disturbed were the dining room, the utility (or laundry) room, and the garage. The investigators testified that they did not look under the beds in either the master bedroom or the guest room. All of the beds were made, and the master bed had folded linens on it, suggesting that no one had slept in the house after the housekeeper had cleaned. Photographs of the interior of the home demonstrated that, other than the three disturbed *656 areas, the remainder of the home appeared to be in impeccable order. The garage door was closed, and Mrs. Monfort's car was missing. The $100 bills Rosario had given to Mrs. Monfort were gone.
Beasley had also disappeared from the premises, but he had left behind a box of his business cards and a box of Doral cigarettes in the guest bedroom. He also left a shaving kit and a can of shaving cream on the back of the toilet fixture in the guest bathroom.
While the crime scene was being investigated, the home was secured, and members of Mrs. Monfort's family were not permitted to enter the house. The family members left the house at the end of the day, after the crime scene was released, but before the investigation team had completed work. Before they left, the lead detective (Detective Cash) asked family members to return to the house the next day, to attempt to identify any missing valuables. They agreed to call Detective Cash after they arrived, so that she could join them at the home.
The next day, Neal O'Toole, Bud Stalnaker (Mrs. Monfort's son) and Bud's wife (Sherry) went to the Monfort home. While looking for missing items of personal jewelry or other valuables, they found a bank bag containing money under the mattress in the master bedroom, but nothing under the bed. In the guest bedroom, Bud also looked between the mattress and the box springs, but found nothing. When he lowered himself to the floor to look under the bed, however, he observed a pair of shoes placed neatly together, with a wadded-up shirt next to the shoes.[3]
Detective Cash had already been contacted, and no one touched either the shoes or the shirt until she arrived at the Monfort home and was advised of the discovery made by Bud. Detective Cash and her partner went immediately into the guest room, where she reached under the bed and retrieved the shirt. She obtained a bag from her car, and when she unfolded the shirt on the bag, she discovered apparent blood on the shirt. Detective Cash then placed the shirt in the bag, and the bag in the trunk of her car.
Subsequent DNA testing on the blood taken from the shirt showed that all parameters tested were consistent (none were inconsistent) with Mrs. Monfort's blood. The testing excluded Beasley as a donor of the blood. The housekeeper identified a picture of the shirt as being the same pattern (but a little lighter) as the shirt which she had seen in the guest bedroom where other items belonging to Beasley were located on the morning of August 21. Officer Pierson identified the shirt as being the same shirt Beasley had worn when he saw him at Benson's house on August 20.
A search for Beasley was initiated from central Florida. During this time, Beasley continued to stay at Mrs. Bennis's house in Miami until he became involved in a physical altercation with Mr. Malcolm. After that, Malcolm's brother transported Beasley to a bus station in Fort Lauderdale. Beasley was eventually found in Alabama, living in a motel with Jeff Ellis. Beasley had grown a beard, and was working at Herndon Electric Company under the false identity of "William Benson." The signature of "William Benson" on certain electric company employment application papers was positively identified by a handwriting expert as Beasley's. When Beasley was discovered, he identified himself as Curtis Wilkie Beasley, and offered no resistance. He was placed under arrest by Officer Jones, orally advised of his Miranda rights, and transported to the Dale County, Alabama, jail. While taking a cigarette break with Officer Jones at the jail, Beasley told Jones that he knew he was in *657 trouble because, when he had gone back to the house, it was surrounded by FBI agents. Beasley said that after he saw the FBI agents he left.
Beasley was charged with first-degree murder, robbery, and grand theft of a motor vehicle. The jury convicted Beasley of all three charges. Following the penalty phase of the trial, the jury recommended death by a vote of ten to two. The trial court followed the jury's recommendation, sentencing Beasley to death for the homicide, and to concurrent terms of fifteen years and five years of imprisonment, respectively, for the robbery and grand theft convictions.

APPEAL
Beasley raises seven claims of error on appeal.[4] We address each claim in turn.

Motion for Judgment of Acquittal
As his first point on appeal, Beasley asserts that the trial court erred in denying his motion for judgment of acquittal, because the circumstantial evidence in this case was not inconsistent with Beasley's reasonable theory of innocence. In moving for a judgment of acquittal, a defendant "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." Lynch v. State, 293 So.2d 44, 45 (Fla.1974). As explained in Lynch:
The courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law. Where there is room for a difference of opinion between reasonable men as to the proof of facts from which the ultimate fact is sought to be established, or where there is room for such differences as to the inference which might be drawn from conceded facts, the Court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail and not primarily the views of the judge. The credibility and probative force of conflicting testimony should not be determined on a motion for judgment of acquittal.
However, where a conviction is based wholly upon circumstantial evidence, a special standard of review applies. See Jaramillo v. State, 417 So.2d 257 (Fla. 1982). As stated in State v. Law, 559 So.2d 187 (Fla.1989):
Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
. . . .
... A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except *658 that of guilt. (Citation omitted). Consistent with the standard set forth in Lynch, if the state does not offer evidence which is inconsistent with the defendant's hypothesis, "the evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained under the law." 293 So.2d at 45. The state's evidence would be as a matter of law "insufficient to warrant a conviction." Fla. R.Crim. P. 3.380.
It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
Id. at 188-89 (citations and footnote omitted).
In this case, Beasley's theory of innocence was that he had already left the Monfort residence when Mrs. Monfort was killed by some unknown perpetrator[5] (possibly one of the other workers at the apartments who had a truck and had possibly seen Mrs. Monfort's transaction with Rosario). Addressing the evidence that drinks had been prepared at the house, Beasley suggested that Mrs. Monfort might either have come home to prepare the drinks before she went out, or prepared the drinks later that evening after she came back home after having eaten dinner. He theorized that, when Mrs. Monfort arrived home sometime after 7 p.m., the killer followed her through the garage door into the house, surprising her in the laundry room adjacent to the garage. Beasley did not, however, suggest that Mrs. Monfort did not have her car with her at this time.
The medical examiner placed the time of death at two to three and a half days prior to the autopsy (which was performed on August 25, 1995). The only reasonable conclusion is that Mrs. Monfort was killed sometime before she retired Monday evening (August 21), because the evidence showed that she was still wearing the business clothing in which she was dressed that morning. Additionally, the next morning's paper lay in its wrapper outside the home.
There is no reasonable defense hypothesis which can reconcile a theory that Mrs. Monfort came home with her car after 7 p.m. on August 21 with the conclusion "that a jury might fairly and reasonably infer from the evidence" that Beasley who was supposed to have left by then was seen by Robinson later that night driving Mrs. Monfort's car. There was substantial, competent evidence (in the form of the direct testimony of Dale Robinson) to support the conclusion that Beasley had Mrs. Monfort's car on the night of the murder. In an attempt to reconcile Robinson's testimony, defense counsel suggested that Beasley used Monfort's car to visit Robinson on some date prior to August 21. However, this hypothesis is inconsistent with the collective testimony of six witnesses: Mrs. Ferguson, Dale Robinson, Detective Krebbs, Jane O'Toole, and Mr. and Mrs. Malcolm.
*659 The housekeeper testified that Monfort's car was greyish-blue. Robinson testified that Beasley came to visit him in August driving a light-colored (white or blue) car, which Beasley said belonged to a woman friend he was working for, and at whose house he had been sleeping for a couple of days. That visit occurred sometime between 8:30 and 10 p.m. On cross-examination, Robinson was imprecise about the exact date in August that Beasley had come to see him. On direct examination, however, he specifically stated that Beasley had come to his home between three and seven days prior to the time that Detective Cash had come to interview him. Ken Krebbs set that interview date as August 28, 1995. Seven days earlier would have been August 21 (the day of the murder). Any time after that would have been the period during which, according to the Malcolms, Beasley was visiting with them in Miami, and had no light-colored car.
Further, Jane O'Toole testified that she never saw Beasley drive her mother's car. She said that her mother drove Beasley to and from work, as the housekeeper testified that Mrs. Monfort did on the day that she was killed. Jane herself drove Beasley on that day (when he helped move furniture), picking Beasley up and dropping him off at the Monfort house. No one testified that Beasley was permitted to drive Monfort's car; rather, there was only evidence that he was always a passenger in the car. There was also evidence that this was Monfort's only car, which she used herself, extensively, for her real estate business. In light of this evidence, it is inconsistent that Monfort, who was always the driver when Beasley was in her car, had given Beasley the use of her car. It was also undisputed that Beasley had no functioning car of his own at the time. In fact, defense counsel never argued that Beasley was driving some other car.
From this collective evidence, a jury might "fairly and reasonably infer" that Beasley was seen by Robinson driving Mrs. Monfort's car sometime between 8:30 and 10 p.m. on August 21. Cf. Lynch v. State, 293 So.2d 44 (Fla.1974) (holding that the trial court did not err in denying defendant's motion for judgment of acquittal where the State was required to prove, as an element of the offense charged, that the attack on the victim took place between 1 and 5 a.m., where the witness testified on direct examination that the attack took place after she left work at 3 a.m., even though her testimony as to time was shaken on cross-examination). No reasonable defense hypothesis regarding an "unknown perpetrator" addresses this fact. Therefore, because the state presented competent, substantial evidence which is inconsistent with Beasley's theory that Mrs. Monfort was killed by an unknown perpetrator, the trial court did not err in denying Beasley's motion for judgment of acquittal.

Competent, Substantial Evidence to Support the Verdict
Having determined that the record contains competent, substantial evidence which is inconsistent with Beasley's theory of innocence as argued at trial, the Court must next determine whether there is competent, substantial evidence to support the jury's verdict. See State v. Law, 559 So.2d at 188 (observing that "[t]he question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse"). Here, such competent, substantial record evidence does exist.
Initially, Beasley argues that the evidence here is not inconsistent with an unpremeditated murder occurring in a rage; therefore, it is insufficient to support a conviction for premeditated, first degree murder. Notwithstanding Beasley's failure to raise this defense at trial,[6] competent, *660 substantial evidence of premeditation exists here, in the character of the weapon, the manner in which it was wrapped and used, the physical evidence surrounding the crime site, and the nature of the victim's injuries.
First, Beasley's counsel emphasized during the trial that he had a good relationship with Mrs. Monfort. Nothing admitted into evidence reflected any history of tension between the two which could have erupted into a violent quarrel. Further, the evidence reflected that Mrs. Monfort's home was kept in good order. The housekeeper, on the morning of the murder, had thoroughly cleaned the home. Photos of the house and garage showed both to be generally neat and tidy. Although the hammer was described as a "weapon of opportunity," there were no photos of either the residence or the garage depicting tools which were out of place, or "lying about." Significantly, in choosing the weapon, the killer took time to carefully wrap the head of the hammer in two kitchen towels. Detective Cash found no towels in the house matching the checkered towel through which the hammer head protruded.
While the most intense blood splatter areas occurred in the laundry room, there was significant evidence that the area of struggle also extended into the adjacent dining room area. There was evidence not only of blood splatter in the dining room and the laundry room, but also of apparent blood smeared on the framework of the door jamb between the two rooms. The blood splatter outside the laundry room door extended 26 inches into the dining room. The autopsy showed that, during the beating, Mrs. Monfort received lacerations behind her left ear. An earring was discovered lying beside a table leg in the dining room.
Most importantly, the medical examiner testified that he found substantial defensive injuries on Mrs. Monfort, which were depicted in photos entered into evidence. Mrs. Monfort sustained such injuries to both hands, to her left forearm, to her left upper arm and upper chest area, and to the top of her left shoulder. In addition to these defensive blows, Mrs. Monfort received a minimum of fifteen to seventeen blows to the head. They were delivered with such force that the impacts fractured both her cheekbone and her left upper jaw; with such intensity that they fractured her skull (causing small fragment formation and brain laceration in the area); and with such savagery that the head of the hammer broke off its handle.
Here, as in Kramer v. State, 619 So.2d 274, 276 (Fla.1993), "[t]he blood splatter and victim injury evidence ... provide a substantial basis for the conclusion that premeditation existed." See also Heiney v. State, 447 So.2d 210, 215 (Fla.1984) (upholding a finding of premeditation based upon circumstantial evidence where there were at least seven blows to the victim's head inflicted by a claw hammer, and the *661 medical examiner testified that any three of the wounds would have been sufficient to render the victim unconscious, so that it would have been unnecessary to inflict the additional beating which occurred if Heiney's only purpose was to rob the victim); Scott v. State, 411 So.2d 866, 868 (Fla.1982) (finding that the evidence was "clearly sufficient to establish premeditation" where "[t]here was a long bloody chase throughout the house, the victim was badly beaten, his hands and feet were tied while he was still alive, and he was struck on the head six times with a blunt instrument"); Dawson v. State, 139 So.2d 408, 413 (Fla.1962) (finding that the "facts established were sufficient to support the inference obviously drawn by the jury that appellant did effect the death of [the victim] by premeditated design" where the "medical evidence showed that [the victim] had suffered not one blow, but multiple cerebral contusions and skull fractures, all sufficient to produce death; a dislocated left shoulder; and a wound in the left temple extending through and fracturing the jaw and knocking out a tooth," supporting the conclusion that "[w]hatever the appellant's state of mind might have been at the beginning of the `tussling,' the number of blows struck, the force employed, the unarmed status of [the victim] and the other circumstances surrounding the unfortunate incident indicate that there was sufficient time for appellant to have formed the intent to kill [the victim] and that he did form and carry out this design"), criticized on other grounds, State ex rel. Carty v. Purdy, 240 So.2d 480, 481 (Fla.1970). In our view, record evidence clearly supports the verdict based upon premeditated murder.
Beasley also argues that the evidence is insufficient to support his conviction for first-degree murder based upon felony murder (robbery). Specifically, he argues, first, that the evidence does not support the conclusion that Beasley took any money from Mrs. Monfort. We disagree.
Direct evidence established that Mrs. Monfort had received eight $100 bills from Rosario sometime between 5 and 5:45 p.m. on the day that she was killed. Rosario testified that Mrs. Monfort gave him a receipt for the money, a copy of which appeared in Mrs. Monfort's receipt book. This money was not found after Mrs. Monfort's death. Further, on the day of the murder, although Beasley asked Jane O'Toole for some money, she had given him none.
There was no evidence to suggest that Beasley had any work at this time other than at the Lake Marie Apartments, and no evidence that he had any money other than that which Monfort and O'Toole had paid him.[7] O'Toole's ledger for the apartments which reflected payments made to Beasley for painting and handyman jobs performed during the last several months before Mrs. Monfort's deathreflected that, during July and August, Beasley had been paid a total of $240. He had made no payments on his debt to Robinson, and Beasley's van (for the repair of which he said he had borrowed the $600 from Robinson) was either not available or not functioning. Yet, on the night of the murder, while visiting Robinson, Beasley showed Robinson a $100 bill. The State thus presented competent, substantial evidence to support the jury's robbery verdict.
In the alternative, Beasley argues (for the first time on appeal[8]) thatif Beasley did, in fact, take the automobile *662 and the moneythe evidence is not inconsistent with their having been taken after the murder as an afterthought;[9] therefore, no robbery occurred. This Court has held that the "taking of property after a murder, where the motive for the murder was not the taking of property, is not robbery." Mahn v. State, 714 So.2d 391, 397 (Fla.1998) (emphasis supplied) (reversing an armed robbery conviction even though cash and an automobile were taken from the victim where the homicides appeared "to have been the product of Mahn's mental and emotional disturbance and prompted by jealousy for his father's attention" rather than a desire to obtain the victim's cash and car); see also Knowles v. State, 632 So.2d 62, 66 (Fla. 1993) (rejecting robbery aggravator where Knowles engaged in apparently senseless shooting of a young girl he did not even know immediately before shooting his father and taking his father's truck); Clark v. State, 609 So.2d 513, 515 (Fla.1992) (upholding pecuniary gain aggravator, but rejecting robbery aggravator, where Clark killed the victim "for the purpose of obtaining the victim's paying job," but also took cash and boots from the victim after he was murdered); Parker v. State, 458 So.2d 750, 754 (Fla.1984) (upholding pecuniary gain aggravator, but rejecting robbery aggravator, where "the entire sequence of events in which the murders occurred was touched off by Parker's desire to establish a remunerative drug-dealing network and his need to establish a reputation as a collector of debts," and "the motive expressed at the time of the killing [of one of the victims from whom jewelry was taken] was to keep the victim from implicating the murderers in the death of [another victim]," rather than to steal some jewelry from her which, only the night before, she had unsuccessfully offered to Parker in payment of the drug debt).
Where an "afterthought" argument is raised, the defendant's theory is carefully analyzed in light of the entire circumstances of the incident. If there is competent, substantial evidence to uphold the robbery conviction, and no other motive for the murder appears from the record, the robbery conviction will be upheld. Cf. Finney v. State, 660 So.2d 674, 680 (Fla.1995) (upholding Finney's conviction for robbery where the State presented sufficient evidence to support the conviction and Finney had not previously raised his "afterthought" theory on motion for judgment of acquittal, observing that "[t]he State is not required to rebut every possible hypothesis that can be inferred from the evidence; it need only present evidence that is inconsistent with the defendant's version of events") (citing Jones v. State, 652 So.2d 346 (Fla.1995), and State v. Law, 559 So.2d 187 (Fla.1989)). Conversely, in those cases where the record discloses that, in committing the murder, the defendant was apparently motivated by some reason other than a desire to obtain the stolen valuable, a conviction for robbery (or the robbery aggravator) will not be upheld.[10]
*663 In Mahn, for example, we determined that the trial court erred in failing to grant the defendant's motion for judgment of acquittal as to the robbery count. There, the defendant, who for many years had been estranged from his father, killed the father's live-in girlfriend and her son when efforts to reconcile with his father proved unsuccessful. Although Mahn took the girlfriend's car and $400 as he fled from the scene, it appeared from the record that a different motive had prompted Mahn to commit the murders:
[W]e conclude here that the homicides did not occur because Mahn wanted to take $400 and a car. Mahn did not know the money was in the house; instead he found it while trying to find a key to a car. He wanted the car to flee the scene of the murders. Additionally, if taking a car had been his original motive, he could easily have accomplished this at almost any time since he lived in the same household. Instead, the homicides appear to have been the product of Mahn's mental and emotional disturbance and prompted by jealousy for his father's attention. He took the money and car after the violence to effect his escape from the scene. We find that a robbery was not proven beyond a reasonable doubt. See State v. Law, 559 So.2d 187, 188 (Fla.1989) ("A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt.")
714 So.2d at 397 (emphasis supplied). In determining that the trial court erred in submitting the armed robbery charge to the jury, this Court found that there was a reasonable hypothesis that Mahn did not intend to steal the girlfriend's money prior to the murders:
Thus, the State argues that the robbery and murders were part of a preconceived *664 design or plan. To that end, the State directs us to Mahn's second videotaped interview with the Oklahoma police. In the interview, Mahn stated that [immediately in the aftermath of the murders] "I tried to take my dad's Corvette first, but I couldn't find the keys. Debbie just said take my car and get out of here." We are unconvinced by the State's argument.
The context of the above passage was Mahn's actions after the murders. Mahn never indicated that he made this determination before the murders as part and parcel of an overall design. Similarly, when questioned by the State during the penalty phase, Mahn stated that he did want to take his father's Corvette after the murders, but clearly stated that was not one of the reasons the murders occurred. Thus, there is no proof that Mahn intended to steal either his father's car or Debra's car prior to the murders.
Likewise, we find that a reasonable hypothesis exists that Mahn did not intend to steal Debra's money prior to the murders. The State relies on Michael Mahn's testimony that Debra "always carried her money in a bag and that it was on the dresser in plain view." However, that fact does not establish that Mahn either knew the moneybag was in his father's bedroom that night or that he intended to steal it. Furthermore, since Mahn testified that he tried to take his father's keys first, and then presumably flee, he would have no reason to take Debra's car keys and the moneybag if he already had his father's keys. That reasonably leads to the conclusion that Mahn took the moneybag as an afterthought in conjunction with his taking of Debra's keys, as he indicated in his statements to the police.
Accordingly, we find that the trial court erred in submitting the armed robbery charge to the jury. Law. Therefore, we reverse Mahn's conviction on this count and remand with directions that this conviction be reduced to grand theft.
714 So.2d at 397 (emphasis added).
In Mahn, as here, although we noted that there was no proof that the defendant had prior knowledge that the victim had the money which was taken, that factor was not dispositive. Rather, the conclusion that the murders were not motivated by a desire to obtain the money and the car was compelled by additional evidence which was inconsistent with the State's theory. First, there was unrefuted evidence of a contrary motive: that the son was jealous for his father's attention. Second, the defendant expressly testified both that his intention was to take his father's car (not the girlfriend's car), and that he did not commit the murders to steal his father's car. Consistent with this testimony, the record reflected that it was only after the defendant failed to obtain the keys to his father's car that he sought out the keys to the girlfriend's car, and took her money. This compelled the conclusion that, had Mahn been successful in effecting his original intent to steal his father's car, the girlfriend's car (and the money found with her keys) would never have been taken.
Similarly, in Knowles (where this Court rejected the "during the course of a robbery" aggravator), there was additional evidence which was inconsistent with the State's theory that the defendant murdered his father to obtain the father's truck. There, on the day of the murders, the defendant had been drinking beer and inhaling toluene, and, just before the homicides, was observed by a neighbor to be "the worst [she] had ever seen him," and acting "like he was completely gone." Right before killing his father, Knowles entered a trailer next door to his father's trailer and shot and killed a ten-year-old girl whom he had never met, for no apparent reason. He then shot his father (who was outside in the father's truck), pulled his father from the truck and threw him to the ground, and left the scene in the truck. *665 This Court, in analyzing the penalty phase of Knowles' trial, determined that the "during the course of a robbery" aggravator was improperly found in connection with the murder of Knowles' father:
The fact that Knowles took his father's truck after shooting Carrie Woods does not establish beyond a reasonable doubt that Knowles killed his father in order to avoid arrest. There is no other evidence that Knowles' dominant motive for killing his father was to avoid arrest. Correll v. State, 523 So.2d 562 (Fla.), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988); Menendez v. State, 368 So.2d 1278 (Fla.1979). Knowles could have shot his father for the same unexplained reason that he shot Carrie Woods, or for some other undisclosed reason, and then decided to leave in the truck which according to testimony he often drove. Moreover, because Knowles had free access to his father's truck prior to the shooting, and there is no evidence that Knowles intended to take the truck from his father prior to the shooting, or that he shot his father in order to take the truck, the aggravating factor of committed during the course of a robbery likewise cannot stand.
632 So.2d at 66. In Knowles, the defendant, who appeared to be "completely gone," first shot a little girl who was a complete stranger to him, without provocation, before shooting his father and taking the truck. Thus, we concluded that Knowles could have shot his father, not to take a truck to which he had "free access" prior to the murder, but "for the same unexplained reason that he shot" the little girl.
As in Mahn and Knowles, the evidence in Clark and Parker revealed another apparent motivation for killing the victims (Clark's desire to obtain the victim's job, and Parker's desire to keep the victim from implicating the murderers of a second victim, who was killed to establish Parker's reputation as a collector of drug debts). Here, in contrast, there is no evidence demonstrating any motive for killing Mrs. Monfort other than to take her money.
There is no indication, as in Mahn, of any interpersonal conflict or animosity between Beasley and Mrs. Monfort. Rather, it was undisputed that Beasley and Mrs. Monfortwho were neither relatives nor intimateshad a cordial relationship characterized by Mrs. Monfort's kindness to Beasley. There is no evidence, as in Knowles, that Beasley was acting "like he was completely gone" just prior to the murder. Although Dale Robinson saw Beasley shortly after the murder was committed, and William Robinson talked with Beasley on the telephone during the same time, neither witness testified to any apparent impairment, or any unusual behavior, on Beasley's part.
This case is more similar to Atwater v. State, 626 So.2d 1325 (Fla.1993). In that case, the jury was instructed on both premeditated and felony murder, and there was ample evidence to demonstrate premeditation. As here, the jury returned a general guilty verdict of murder. While Atwater did not challenge the sufficiency of the evidence supporting his murder conviction, he did attack the robbery conviction, claiming that the evidence introduced by the State to support the charge was not sufficient.
At trial, Atwater presented two defenses to robbery, one of which was that the theft was an afterthought. In rejecting this argument, we reasoned:
Where circumstantial evidence is relied upon to prove a crime, in order to overcome a defendant's motion for judgment of acquittal, the burden is on the State to introduce evidence which excludes every reasonable hypothesis except guilt. The State is not required to conclusively rebut every possible variation of events which can be inferred from the evidence but only to introduce competent evidence which is inconsistent with the defendant's theory of events. *666 State v. Law, 559 So.2d 187, 189 (Fla. 1989). Once this threshold burden has been met, the question of whether the evidence is sufficient to exclude all reasonable hypotheses of innocence is for the jury to determine.
In the instant case, the State presented testimony showing that Atwater had obtained money from Smith on previous occasions, that Smith feared Atwater, and that, on the day of the murder, Smith told a friend that he was not going to give Atwater any more money. Further, there was evidence that Smith had cash in his trousers pocket shortly before the killing. When the body was found, the pockets were turned out and the only money found in the room was a few pennies on the floor. We conclude that the judge properly denied the motion for judgment of acquittal and that there was sufficient evidence to convict of robbery.
626 So.2d at 1327-28 (emphasis added). In Atwater, there was no proof that the defendant had foreknowledge that the victim had money at the specific time that he was murdered; only that he had obtained money from the victim on previous occasions. Here, too, the checkbook and ledger from the Lake Marie Apartments reflected that, on numerous occasions in the months prior to the murder, Mrs. Monfort (as manager of the apartments owned by her son-in-law, Neal O'Toole) had given Beasley payment (several times, in cash) for various painting and handyman jobs that Beasley had done at the apartments.
In Atwater, there was evidence that the victim had cash in his trousers pocket shortly before the killing and that, when his body was found, the pants pockets were turned out and the only money in the room was a few pennies on the floor. Here, too, shortly before she was killed, Mrs. Monfort was given eight $100 dollar bills by Mr. Rosario late in the day, which were not found with her body, in her purse, or in her car. On the day of the murder, Beasley had asked Mrs. Monfort's daughter (Mrs. O'Toole) for money, but received none. Yet, within hours after the murder, while visiting Dale Robinson, Beasley was seen driving Mrs. Monfort's car and offering to use a $100 bill in partial payment of a debt Beasley owed Robinson (which Robinson told Beasley to use to buy crack cocaine for the two of them to smoke instead). These facts distinguish this case from cases in which there is another apparent motivation for the killing, and no indication that the defendant wants or needs the valuables which are taken after the murder. Cf. Clark v. State 609 So.2d 513, 515 (Fla.1992) (holding that the trial court erred in finding the aggravator that the murder was committed during a robbery where "Clark took Carter's money and boots from his body after his death... [but] no one testified that Clark planned to rob Carter, that Clark needed money or coveted Carter's boots, or that Clark was even aware that Carter had any money," and thus there was "no evidence that taking these items was anything but an afterthought," but upholding the "pecuniary gain" aggravator because there was evidence that Clark had murdered Carter, instead, to obtain Carter's job).
In two separate cases styled Jones v. State, this Court rejected "afterthought" arguments as applied to valuables taken from the victims where no other motivation for the murders appeared from the record. In the first, Jones v. State, 652 So.2d 346, 348, 350 (Fla.1995), Jones, who had been recently employed by his victims (Mr. and Mrs. Nestor), first killed Mrs. Nestor and then Mr. Nestor, rolling him over to take his wallet. Sometime thereafter, he rifled through Mrs. Nestor's purse, taking some valuables. Jones later told a nurse who treated him for an injury sustained during the incident that he killed "those people" because they "owed" him money. In that case, as here, there was evidence to support the conclusion that the murders had been committed to obtain the valuables, and no evidence to the contrary.
*667 In the second case, Jones v. State, 690 So.2d 568, 570 (Fla.1996), the murders were committed in the aftermath of a misunderstanding regarding Jones' attempt to purchase a car with a dishonored check. There, in assessing the applicability of the pecuniary gain aggravator, the Court determined that a robbery had occurred, even though Jones had already taken possession of the car prior to the murders:
We have previously held that the pecuniary gain aggravator is applicable in cases where "the murder was motivated, at least in part, by a desire to obtain money, property or other financial gain." Finney v. State, 660 So.2d 674, 680 (Fla. 1995), cert. denied, [516 U.S. 1096, 116 S.Ct. 823, 133 L.Ed.2d 766] (1996). Although Jones already had physical possession of the car at the time of the crimes, based on the evidence in this case there is no reasonable hypothesis other than that Jones murdered Monique Stow and attempted to murder Ezra Stow in order to obtain ownership of the car and to resolve the problem over the dishonored check. The fact that the car papers were missing from Ezra Stow's desk after the murder and attempted murder support this finding as does the fact that after committing the crimes Jones disposed of the car papers and the gun and hid the car.

(Emphasis supplied.) Here, similarly, there was evidence to show that Mrs. Monfort received $900 cash shortly before she was murdered and that, later that night, Beasley was seen with a $100 bill and Mrs. Monfort's car, which he disposed of prior to traveling to Miami (where he appeared, with neither cash nor car, the next day). The record evidence does not suggest any other reasonable hypothesis to explain why Mrs. Monfort was killed.
In Finney, 660 So.2d at 680, we rejected Finney's contention that the taking of the murder victim's VCR was an afterthought, concluding that, on the record before us, there was "no reasonable hypothesis" other than that Finney killed Ms. Sutherland to take her property:
Ms. Sutherland's VCR was pawned by Finney within hours of the murder; her mother testified that her jewelry box was missing; and there also was testimony that Ms. Sutherland's bedroom was ransacked and the contents of her purse was dumped on the floor. As noted above, Finney never argued to the judge or jury that the victim was killed for some reason other than robbery. The State is not required to rebut every possible hypothesis that can be inferred from the evidence; it need only present evidence that is inconsistent with the defendant's version of events. State v. Law, 559 So.2d 187 (Fla.1989). Here, the State presented sufficient evidence to support the convictions. Cf. Jones v. State, 652 So.2d 346 (Fla.1995).
Similarly, we reject Finney's contention that there was insufficient evidence to support the trial court's finding that the murder was committed for pecuniary gain. § 921.141(5)(f). In order to establish this aggravating factor, the State must prove beyond a reasonable doubt that the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain. See Clark v. State, 609 So.2d 513, 515 (Fla.1992); Peek v. State, 395 So.2d 492, 499 (Fla.1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981). The fact that Finney pawned the victim's VCR shortly after the murder, along with the evidence that Ms. Sutherland's jewelry box was missing and the contents of her purse had been dumped on the floor, supports the finding that the murder was committed for pecuniary gain.
(Emphasis supplied.) In this case, as in Finney, there was evidence that, shortly before her murder, Mrs. Monfort had the valuable which was taken ($900 in cash, including eight $100 bills), and that, shortly thereafter, the defendant was seen with part of it (a $100 bill) in his possession. *668 As in Finney, this supports the conclusion that the murder "was motivated, at least in part, by a desire to obtain money, property, or other financial gain." See also Randolph v. State, 463 So.2d 186, 190 (Fla. 1984) (upholding combined aggravating circumstances of pecuniary gain/commission during a robbery where evidence showed that the victim had $100 cash on him just a few hours before his murder, and, after the murder, only $20 was found hidden in a passenger door compartment of his truck, which evidence was relevant to demonstrate the "distinct probability that Randolph [who was charged with first degree murder and attempted robbery] approached the victim on the evening in question to rob him, and, in fact, did rob him").
Upon review of the entire record in this case, we find that Beasley's convictions are supported by substantial, competent record evidence. See § 921.141(4), Fla. Stat. (1999); Fla. R.App. P. 9.140(h). Therefore, the jury's verdict will not be disturbed.[11]See Law, 559 So.2d at 188-189.

Trial Court's Failure to Exclude the Victim's Family
Next, Beasley contends that the trial court erred in denying defense counsel's request to invoke the rule of sequestration as to the victim's daughter and son, who were key witnesses in the case. There are two bases upon which a defendant may object to the trial court's decision not to apply the rule of sequestration to a witness who is the victim's next of kin. First, one could argue that the witness has changed key testimony to conform to the evidence presented.[12] As stated in Gore v. State, 599 So.2d 978, 986 (Fla.1992) (citations omitted):
The rule of witness sequestration is designed to help ensure a fair trial by avoiding "the coloring of a witness's testimony by that which he has heard from other witnesses who have preceded him on the stand." However, a defendant does not have an absolute right to exclude witnesses from the courtroom. "The trial judge is endowed with a sound judicial discretion to decide whether particular prospective witnesses should be excluded from the sequestration rule." Of course, should the witness' presence cause some prejudice to the accused, the witness should not be allowed to remain in the courtroom. Where the rule has been invoked, a hearing should be conducted to determine whether a witness' exclusion from the rule will result in prejudice to the accused.
In Gore, the appellant claimed that the trial court erred in excusing the victim's stepmother from the rule of witness sequestration solely because she was a relative of the victim. In analyzing Gore's claim, this Court observed that the Florida Constitution grants to the next of kin of homicide victims "the right to be informed, to be present, and to be heard when relevant, *669 at all crucial stages of criminal proceedings, to the extent that these rights do not interfere with the constitutional rights of the accused." Art. I, § 16(b), Fla. Const. The Court noted, however, that this provision does not provide an automatic exception to the rule of sequestration. "While in general relatives of homicide victims have the right to be present at trial, this right must yield to the defendant's right to a fair trial." 599 So.2d at 985-86.
In Gore, the Court found that the courtroom presence of the stepmother (who testified only regarding jewelry which the victim commonly wore) did not prejudice the defendant. Therefore, it found no abuse of discretion in allowing this nonmaterial witness to be excluded from the rule. Id.
Here, the trial court heard argument of counsel before deciding whether the sequestration rule would be applied to the victim's next of kin. Key to her decision was the fact that the witnesses' testimony had been memorialized in prior depositions. Under these circumstances, the trial court did not err in denying defense counsel's request to apply the rule of sequestration to the victim's next of kin.
A second area of concern may be the prejudice potentially caused by emotional reactions of the victim's family members. In Burns v. State, 609 So.2d 600, 605(Fla.1992), Burns claimed that he was deprived of a fair trial because of emotional displays by the victim's wife. There, the Court determined that the record did not reveal any prejudicial exhibition of emotion entitling Burns to a new trial.
Here, similarly, although Beasley contends that, "[d]uring the course of the trial, counsel repeatedly brought to the court's attention disruptions caused by family members," the record reflects that the trial court maintained vigilance so that the defendant would not be prejudiced by any emotional displays. Twice, the court cautioned the audience to keep its comments and emotions in check, and directed counsel to advise family members accordingly. At the outset, the court indicated to the victim's adult children that they could be held in contempt for breaches of proper courtroom etiquette. During closing argument, the court carefully observed the family members and the jury to be sure that the jury was not distracted by any emotional reactions. Prior to the medical examiner's discussion of Mrs. Monfort's extensive injuries, the court provided an opportunity for members of the audience including family membersto excuse themselves from the courtroom. On the two occasions when the victim's daughter needed to compose herself, a break was taken to allow her to do so. Under these facts, the trial court does not appear to have abused its discretion in allowing the victim's family members to remain in the courtroom, subject to the safeguards which it imposed.

Heinous, Atrocious or Cruel Aggravator
In Willacy v. State, 696 So.2d 693, 695 (Fla.1997), this Court observed that, in considering the propriety of an aggravating factor, this Court will determine, based upon review of the record, whether the trial court applied the correct rule of law and whether competent, substantial evidence supports its finding. Here, Beasley argues that, although Mrs. Monfort suffered extensive injuries from being bludgeoned with a hammer, because she may have been rendered unconscious shortly after the attack began, the murder was not heinous, atrocious or cruel ("HAC").
However, the length of the victim's consciousness is not the only factor considered in assessing evidence supporting the HAC aggravator. As stated in Lott v. State, 695 So.2d 1239, 1244 (Fla. 1997), "[t]he fear and emotional strain suffered by the victim can also be considered in determining whether the murder was heinous, atrocious, or cruel." Accord Preston v. State, 607 So.2d 404, 410 (Fla.1992).
*670 In Lott, appellant argued that the murder was not HAC because the victim might not have been conscious at the time the fatal slash was inflicted. This Court disagreed, observing that, although the victim "may not have been conscious at the time that Lott made the fatal slash which caused her death, the physical torture and emotional trauma she suffered during the time leading up to her death justify application of the HAC aggravator." 695 So.2d at 1244. Accord Gore v. State, 706 So.2d 1328, 1335 (Fla.1997) (observing, in upholding HAC factor even though victim's "death by gunshot was most likely instantaneous," that "the fear and emotional strain of the victim from the events preceding the killing may contribute to its heinous nature"); James v. State, 695 So.2d 1229, 1235 (Fla.1997) (observing that, although "the HAC aggravator does not apply to most instantaneous deaths or to deaths that occur fairly quickly, fear, emotional strain, and terror of the victim during the events leading up to the murder may make an otherwise quick death especially heinous, atrocious, or cruel"). As stated in Swafford v. State, 533 So.2d 270 (Fla.1988), "the victim's mental state may be evaluated for purposes of such determination in accordance with a common-sense inference from the circumstances." 533 So.2d at 277 (citing Preston v. State, 444 So.2d 939, 946 (Fla.1984) (observing that the "victim must have felt terror and fear as these events unfolded")).
Here, the medical examiner testified regarding numerous "typical defensive injuries" which Mrs. Monfort sustained in trying to fend off the killer's attack. Mrs. Monfort suffered these blows to the backs of both upper arms, to her left shoulder, and to the back of her left forearm. Importantly, she had lacerations, bruises and abrasions on the backs of both hands. Her right hand held eleven hair fragments consistent with her own head hair, ranging from 3¾ inches long to 4¼ inches long hairs which, during the struggle, she may have pulled out of her own head. All of the blows were consistent with having been made by a hammer, although the medical examiner could not precisely determine which end of the hammer was utilized for each wound. The indentation in Mrs. Monfort's skull was in the shape of a figure eight.
The "common-sense inference from the circumstances" is that Mrs. Monfort was not rendered immediately unconscious; rather, she suffered a horrendous ordeal before her death. She was fending off a series of repeated, individual blows by a hammer which landed on her forearm, her shoulder, and her upper arms. The hammer not only left bruises in these places; it also left lacerations on the backs of both hands. This evidence compels the conclusion that Mrs. Monfort's hands were not just positioned out in front of her, or to one side, while she was being attacked; they must have been positioned on her head, or perhaps in front of her face (as her left cheek and jaw were being fractured by hammer blows), trying in vain to fend off further blows to the face and head, or (as the State surmised) clutching her head in pain from prior blows. The force of the blows not only caused the hammer head to protrude from the towel in which it was wrapped; it even caused the head to break off its handle. Because of the circumference of the surface with which Mrs. Monfort was being struck, common sense dictates that it would have taken more than one blow to cause the injuries to the backs of her hands alone. This evidence belies an argument that Mrs. Monfort might have been rendered unconscious before she suffered pain, and horrific emotional trauma, from her brutal attack. The defense position simply defies logic and common sense.
In Roberts v. State, 510 So.2d 885, 894 (Fla.1987), the Court addressed an argument (similar to Beasley's) which Roberts made in challenging the trial court's finding of HAC. There, the Court explained:

*671 We find no merit to Roberts' contention that since Napoles was killed by what Roberts characterizes as a rapid series of blows to the back of the head which he did not anticipate this aggravating factor was not supported by the evidence. The evidence amply supports this finding. The evidence does establish that Napoles was killed as a result of numerous blows to the back of the head. However, evidence of severe injury to Napoles' hands supports the conclusion that after the initial blow from behind, Napoles attempted to fend off further blows. Evidence of such defensive wounds has been held sufficient to support a finding that the murder was especially heinous, atrocious or cruel. See Wilson v. State, 493 So.2d 1019 (Fla. 1986) (finding that murder was especially heinous, atrocious or cruel was supported by evidence that victim was brutally beaten while attempting to fend off blows to the head, before he was fatally shot); Heiney v. State, 447 So.2d 210 (Fla.) (murder was especially heinous, atrocious or cruel where victim received defensive wounds to hands while trying to fend off seven severe hammer blows to the head), cert. denied, 469 U.S. 920, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984).
Consistent with Roberts and the cases cited therein, we find that the trial court applied the correct rule of law,[13] and that competent, substantial evidence supports the trial court's finding of the HAC aggravator in this case. See also James v. State, 695 So.2d 1229 (Fla.1997) (upholding HAC aggravator despite the undisputed fact that death occurred quickly where the trial court, who found that the victim knew the defendant well, had observed that "one can only imagine the fear and horror that she felt when her eyes opened and she felt her neck being strangled and the air being cut off from her during this murder as she looked in the defendant's face"); Adams v. State, 341 So.2d 765, 769 (Fla.1977) (observing that the murder was especially heinous, atrocious, and cruel where the record reflected that Adams murdered his victim by beating him past the point of submission and until his body was grossly mangled).

Trial Court's Failure to Find Certain Mitigating Factors
In Zack, 753 So.2d at 19, this Court, quoting Campbell v. State, 571 So.2d 415, 419 (Fla.1990), stated that the trial court cannot refuse to consider relevant mitigating factors:
When addressing mitigating circumstances, the sentencing court must expressly evaluate in its sentencing order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature.... The court must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence....
(Footnotes omitted.)
In Blanco v. State, 706 So.2d 7, 10 (Fla. 1997) (footnotes omitted), this Court summarized the Campbell standards of review for mitigating circumstances:
The Court in Campbell ... established relevant standards of review for mitigating circumstances: 1) Whether a particular circumstance is truly mitigating in nature is a question of law and subject to de novo review by this Court; 2) whether a mitigating circumstance has been established by the evidence in a given case is a question of fact and subject to the competent substantial evidence standard; and finally, 3) the weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard.
*672 Here, Beasley contends that the trial court erred in determining that three circumstances which the trial court found to have been proven were not mitigating in nature (Beasley's poor/rural background, the death of his father [which occurred after the murder, while Beasley was incarcerated], and his expressions of sorrow for Mrs. Monfort's death, and gratitude for her kindness to him). Additionally, Beasley challenges the trial court's finding that his claimed good behavior during trial, which the trial court determined was "not unusually good," was not proven as a mitigator.
With respect to the latter claim, there is competent, substantial evidence to support the trial court's conclusion that this mitigating factor was not proven. A bailiff who testified during the penalty stage reported an incident in which Beasley had thrown a tantrum in his holding cell, expressing dissatisfaction with the evidence which had been presented that day. This outburst included kicking and throwing things. Based upon that testimony, the trial court did not err in determining that Beasley's trial behavior was not "unusually good" and, thus, was not proven as a mitigator. See Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla.1981).
In Campbell, the Court, citing Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), defined a mitigating circumstance as "`any aspect of a defendant's character or record and any of the circumstances of the offense' that reasonably may serve as a basis for imposing a sentence less than death." 571 So.2d at 419 n. 4. Relevant to this appeal, we indicated in Campbell that an abused or deprived childhood and remorse should be considered as valid mitigating circumstances. 571 So.2d at 420.
"Remorse" is defined in Webster's Third New International Dictionary 1921 (1993), as "a gnawing distress arising from a sense of guilt for past wrongs (as injuries done to others)." Given this definition, as the Fourth District (in discussing why a defendant's lack of remorse which is not "repugnant, odious and accompanied by a confession," cannot be used as a reason to depart from sentencing guidelines) queried,
How can one be expected to show remorse concurrently with the maintenance of innocence? Nor does a jury guilty verdict automatically extinguish the right to continued proclamation of blamelessness. Moreover, even if it did, defendants at sentencing could avoid aggravation by simply declaring their innocence and gratuitously expressing sorrow for the victim.
Mischler v. State, 458 So.2d 37, 38 (Fla. 4th DCA 1984), approved, 488 So.2d 523 (Fla.1986). As observed in Robinson v. State, 520 So.2d 1, 6 (Fla.1988), a lack of remorse is not considered an aggravating factor in death penalty cases. While "[a]ny convincing evidence of remorse may properly be considered in mitigation of the sentence," the absence of remorse "should not be weighed either as an aggravating factor [or] as an enhancement of an aggravating factor." Pope v. State, 441 So.2d 1073, 1078 (Fla.1983).
Here, Beasley has turned this analysis on its head, suggesting that an expression of mere sorrow (rather than remorse) should be considered as a mitigating factor. Were this factor deemed to be a mitigator, then, just as "defendants at sentencing could avoid aggravation [if lack of remorse were deemed to be an aggravator] by simply declaring their innocence and gratuitously expressing sorrow for the victim," defendants at sentencing could likewise enhance their position by "gratuitously expressing sorrow for the victim." Because Beasley has presented no compelling argument for recognition of this new category of mitigator, the trial court did not err in finding that Beasley's expression of sorrow for, and gratitude to, the victim was not a mitigating circumstance.
The mitigating factors considered in this case fit into two categories: factors negatively *673 impacting Beasley's life (occurring prior to the murder), and factors demonstrating his positive attributes (occurring at any time). On appeal, Beasley challenges the ruling that his claimed "poor/rural background" was not a mitigator.
In Burns v. State, 699 So.2d 646 (Fla.1997), the trial court found in mitigation that Burns was "one of seventeen children raised in a poor rural environment and consequently had few economic, educational, or social advantages, but despite these disadvantages, he is intelligent and became continuously employed after high school." 699 So.2d at 648 (emphasis supplied). Here, in contrast, Beasley does not appear to have been deprived by his childhood environment. His mother testified that Beasley had a "good childhood." This is consistent with the oral history given by Beasley to Dr. Dee, which reflected that Beasley had positive childhood memories. Beasley went to baseball games with his father, was involved in sports and a church community, and was successful and well-liked in high school. On this record, the trial court did not err in finding that Beasley's claimed "poor/rural background" was not mitigating in character.
Lastly, Beasley claims that the trial court erred in failing to consider the death of Beasley's fatherwhich occurred while Beasley was incarceratedas a mitigator. Documents showing Beasley's depression over his father's death, and a letter written to his father from prison, were admitted in support of this mitigating factor.
On this record, any error which may have been committed in failing to consider this factor as mitigatingto the extent it could have shown that Beasley cared for his fatherwould be harmless. Here, the trial court considered, in mitigation, not only the fact that Beasley `maintained good family relationships while incarcerated,' and that he was a "good son," but also a number of other positive social relationships which Beasley had demonstrated (such as maintaining contact with his children and grandchildren, and being a good brother and a good friend). Further in all fairness to the trial court's rulingthis factor was presented (together with the suicide of one of Beasley's friends), not as an incident reflecting Beasley's caring nature, but as a death which had affected his life. The suicide of Beasley's friend (which occurred in 1983) was considered by the court as a mitigator, and accorded some weight. In contrast, because the impact of his father's death could not have affected Beasley at the time of the murder, when viewed in this context, the trial court did not err in failing to consider it as mitigation.

Proportionality
As we stated in Tillman v. State, 591 So.2d 167 (Fla.1991), "[b]ecause death is a unique punishment," proportionality review is conducted in every death case. That review is "a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law." Id. at 169. It is not a comparison between the number of aggravating and mitigating circumstances; rather, it is a "thoughtful, deliberate proportionality review to consider the totality of the circumstances in a case, and to compare it with other capital cases." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990).
As his last point, Beasley argues that the individual mitigating circumstances which the trial court found to exist, being many in number,[14] are "substantial."[15] *674 As emphasized in State v. Dixon, 283 So.2d 1, 10 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), "the procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present."
In capital cases, "it is this court's responsibility to insure that the trial judge remains faithful to the dictates of Section 921.141, Florida Statutes in the sentencing process." Randolph v. State, 463 So.2d 186, 194 (Fla.1984) (quoting from Mikenas v. State, 367 So.2d 606, 610 (Fla. 1978)). However, this Court has recognized that its appellate role is sentence review, not sentence imposition. See Randolph v. State, 463 So.2d 186, 193 (Fla. 1984) (citing Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla.), cert. denied, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981); Mikenas v. State, 367 So.2d 606, 610 (Fla.1978) (observing that "[i]t is not the function of this Court to cull through what has been listed as aggravating and mitigating circumstances in the trial court's order, determine which are proper for consideration and which are not, and then impose the proper sentence"; rather, "[i]n accordance with the statute, the culling process must be done by the trial court")). Upon that review, it appears that, compared to other cases, the death sentence imposed here is not disproportionate.
As discussed above, the trial court applied the correct rule of law in making its findings regarding the HAC and pecuniary gain/robbery aggravators, and in according weight to those factors. Further, the record supports the trial court's findings regarding aggravating and mitigating factors. Here, the trial court, after carefully considering the aggravating and mitigating factors, concluded that "[t]he mitigating factors, while lengthy, when weighed in their totality, [do] not outweigh the aggravating circumstances. The aggravating circumstances far outweigh the mitigating circumstances presented."
Nonetheless, Beasley argues that his sentence is disproportionate, likening his *675 case to DeAngelo v. State, 616 So.2d 440 (Fla.1993), Songer v. State, 544 So.2d 1010 (Fla.1989), and Scull v. State, 533 So.2d 1137 (Fla.1988). However, unlike the sentencing order in Scull (which this Court found to be "replete with error"), here the trial court's order reflects that it properly considered all of the evidence, and made a determination concerning the weight to be given to each factor, consistent with the dictates of Campbell. Whereas the trial court in Scull had found several aggravating circumstances "without the support of the record," 533 So.2d at 1142, here the record supports the trial court's findings of HAC and the pecuniary gain/ robbery aggravator. On this record, the gravity of the HAC aggravator was not reduced by the nature of the mitigating factors (which did not include any statutory mental mitigators); thus, the trial court did not err in according the HAC aggravator very great weight. Beasley's reliance on Scull is misplaced.
Songer, too, is inapposite. Songer was described by this Court as a case involving an "almost total lack of aggravation and the presence of significant mitigation." 544 So.2d at 1011. "Indeed," the Court observed, "this case may represent the least aggravated and most mitigated case to undergo proportionality analysis." Id. The only aggravating circumstance in Songer was that the defendant was under a sentence of imprisonment (he had walked away from a prison work-release program) at the time the murder was committed. From the outset, then, the facts of Songer are clearly distinguishable.
Lastly, Beasley asserts that his case is similar to DeAngelo. DeAngelo involved a strangulation death in which the State failed to prove beyond a reasonable doubt that the victim was conscious during the ordeal. In reaching this conclusion, the trial court "focused on the absence of defensive wounds, the lack of any evidence that there was a struggle, the presence of a substantial amount of marijuana in [the victim's] system, and the medical examiner's testimony as to the possibility that, at the time she was strangled, [the victim] was unconscious." 616 So.2d at 443. On appeal, this Court refused to disturb the trial court's ruling that HAC had not been proven. Here, in contrast, the trial court's finding of HAC was properly accorded "very great weight." Thus, DeAngelo, too, is distinguishable. We conclude that the death penalty imposed here for this particularly brutal murder is proportionate when compared with other cases in which a death sentence has been upheld. See Sliney v. State, 699 So.2d 662 (Fla.1997); Spencer v. State, 691 So.2d 1062 (Fla. 1996); Foster v. State, 654 So.2d 112 (Fla. 1995).

CONCLUSION
In summary, we affirm Beasley's first-degree murder conviction and sentence of death. We also affirm Beasley's convictions and sentences for robbery and grand theft.
It is so ordered.
WELLS, C.J., and HARDING, PARIENTE, LEWIS and QUINCE, JJ., concur.
SHAW and ANSTEAD, JJ., concur in result only.
NOTES
[1] After Beasley had been taken into custody, Mrs. Monfort's car was eventually found in a parking lot at a Howard Johnson Hotel in Orlando, approximately two and a half miles from the bus station, and within two miles of three different locations to which telephone calls had been made from the Monfort home on August 21. The relevant telephone numbers belonged to persons known to Beasley (two attorneys and the husband of a former sister-in-law), but not known to Mrs. Monfort. The officer who responded to the call from Howard Johnson's was told that the vehicle had been there approximately two weeks. Although the car's dome light had been removed, the car was not damaged, and the odometer reflected that it had been driven very few miles since an oil change that had occurred on a date prior to Mrs. Monfort's death. The car's license plate had expired three months earlier, the doors and trunk were locked, and there was no evidence that anyone other than Mrs. Monfort and Beasley (whose cigarette butts were in the car) had been inside it.
[2] Microscopic examination of these Caucasian human head hair fragments showed that they were consistent with the known head hair sample from Mrs. Monfort. Therefore, the hairs could have come from her. There was nothing inconsistent in any way between Mrs. Monfort's known hairs and the hair fragments. On the other hand, the hairs were microscopically different from Beasley's known head hair sample. Therefore, the hairs could not have come from him.
[3] At trial, Bud Stalnaker testified that he did not go near the laundry room, and did not place the shirt under the guest bed.
[4] These claims are: (1) the trial court erred in denying Beasley's motion for judgment of acquittal at the close of the evidence; (2) Beasley's conviction for first degree murder (based either on premeditation or felony murder) is not supported by competent, substantial evidence; (3) the trial court erred in denying Beasley's request to invoke the rule of sequestration as to the victim's daughter and son, who were key witnesses in the case; (4) the trial court erred in finding the heinous, atrocious, or cruel aggravating circumstance; (5) the trial court erred in finding the pecuniary gain/course of robbery aggravating circumstance; (6) the trial court erred in rejecting, as mitigating factors, Beasley's poor/rural background, the death of Beasley's father, Beasley's expressions of sorrow regarding the victim's death and gratitude for her kindness (coupled with his continued claim of innocence), and Beasley's claim of good behavior during the trial; and (7) Beasley's death sentence is not proportionate.
[5] In an effort to discredit the blood-stained shirt which linked him to the murder, Beasley did not maintain that the shirt was not his; rather, he suggested that it may have been in the laundry room at the time of the murder, and later "planted" by a family member (possibly Bud Stalnaker, who found the shirt) to incriminate him. There was no evidence to support a suggestion that the shirt may have been in the laundry room, and Bud Stalnaker directly denied having ever gone near the laundry room, or having placed the shirt under the guest bed.
[6] On appeal, Beasley argues, alternatively, that the murder was an unpremeditated act of rage, and that the money and car were taken as afterthoughts. Even in the penalty phase, Beasley did not present these specific theories to the trial court. Therefore, the State was not required to rebut them. See State v. Law, 559 So.2d at 189 (observing that "[t]he state is not required to `rebut conclusively every possible variation' of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events"); see also Bertolotti v. Dugger, 514 So.2d 1095, 1096 (Fla.1987)(holding that, "[i]n order to preserve an issue for appellate review, the specific legal argument or ground upon which it is based must be presented to the trial court"), citing Tillman v. State, 471 So.2d 32 (Fla.1985). However, in assessing the sufficiency of the record evidence to support Beasley's convictions, these new theories have, nonetheless, been addressed here. Cf. Woods v. State, 733 So.2d 980, 984-85 (Fla. 1999) (observing, in a case based wholly upon circumstantial evidence, where the appellant had submitted a boilerplate motion for acquittal yet argued on appealbased upon grounds not presented to the trial courtthat the lower court had erred in denying his motion because of insufficient evidence of premeditation, that, "[i]n any event, upon review of the record, we find no error").
[7] Although evidence was introduced at Beasley's Spencer hearing (and thus not considered by the jury), which reflected that Beasley had reported to Dr. Dee that, until the end of his career, Beasley had supported himself by smuggling drugs, the exact time frame involved was not clear. Further, such information was provided for the trial court's consideration prior to imposing sentence, rather than during the guilt phase.
[8] In moving for judgment of acquittal below, Beasley merely challenged the sufficiency of the evidence to support the robbery charge, contending that the murder was committed by an unknown perpetrator.
[9] This analysis also resolves the issue of whether the trial court erred in finding the pecuniary gain/robbery aggravator.
[10] This reasoning (that no robbery occurs where the victim's murder is motivated by some desire other than to take the victim's valuables) is similar to the analysis sometimes applied to determine whether a "felony murder" has been committed by all participants in cases where a victim has been murdered by a single perpetrator during a robbery committed by multiple defendants. In such cases, the codefendant who did not actually kill the victim may contend that there is evidence from which a jury could reasonably conclude that the murder was independent of, rather than in furtherance of, the underlying robbery (or, that no felony murder occurs when the victim's murder is committed for some reason other than to further the robbery). See Ray v. State, 755 So.2d 604, 609 (Fla.2000) (observing that the "independent act" doctrine "arises when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, `which fall outside of, and are foreign to, the common design of the original collaboration'") (quoting Dell v. State, 661 So.2d 1305, 1306 (Fla. 3d DCA 1995)); Rodriguez v. State, 571 So.2d 1356 (Fla. 2d DCA 1990)(finding that Rodriguez, who did not know about the murder until sometime after the incident occurred, was entitled to an "independent act" jury instruction where Rodriguez and a cofelon had planned an armed robbery of a service station and a store, but the murder occurred after Rodriguez had already exited the store, and the defense theory was that the murder was a spiteful act of the cofelon as an afterthought to the attempted robbery rather than an attempt to eliminate an eyewitness); Bryant v. State, 412 So.2d 347 (Fla.1982) (holding that, where the victim was alive when the defendant left the scene and the cofelon remained with the victim, there was evidence from which a jury could conclude that the defendant had withdrawn from the criminal enterprise before the sexual battery and death of the victim occurred).

Where there is record evidence that the murder was independent of (and not in furtherance of) the underlying felony of robbery, the codefendant will be entitled to an "independent act" jury instruction. However, as recognized in Dell, where no such evidence exists, he will not:
The relevant issue presented to us on this appeal is whether, as in Rodriguez, there was any evidence introduced at the trial below from which a jury could reasonably conclude that the murder of the male clerk was independent of and not in furtherance of the underlying felony of robbery. We conclude that there was not and for this reason, this case is factually distinguishable from Rodriguez. In this case, the male store clerk was shot and killed even though he fully complied with the demands made upon him by Walker. Hence, in this case, unlike Rodriguez, there was no evidence from which a jury might reasonably conclude that there was any personal animosity or ill will between Walker and the murdered clerk. Although Michael Dell may not have been physically present when Walker killed the male clerk, he was certainly present when Walker had earlier attempted to kill the female clerk in the store and there was no evidence to indicate that Michael Dell attempted to withdraw from or disavow the acts of Walker at that time; to the contrary, he attempted to assist Walker in effectuating their getaway in the victim's car. The evidence introduced below leads to but one conclusionthat Walker shot both clerks in an effort to eliminate the only eyewitnesses to the trio's felony.
Given all of these facts, we conclude that there was no evidence to support Michael Dell's contention that the murder of the male clerk was not committed in furtherance of the planned robbery. The trial court therefore correctly refused to give the independent act jury instruction.
661 So.2d at 1307 (emphasis added).
[11] Based upon the same reasoning, we find that the trial court did not err in finding the pecuniary gain/robbery aggravator (i.e., that the murder was committed to facilitate taking the victim's money). Cf. Zack v. State, 753 So.2d 9 (Fla.2000)(finding, inter alia, that the evidence was sufficient to show that Zack's theft of the victim's car was a part of his planand negated Zack's reasonable hypothesis of innocence that the theft of the car was an afterthought brought about by panic following the victim's murderwhere Zack was aware that he would need a vehicle to leave the scene of the homicide, and the vehicle would be useful in carrying away the items Zack intended to steal and pawn); Randolph v. State, 463 So.2d 186, 190 (Fla.1984)(upholding pecuniary gain/robbery aggravator where evidence showed that victim had $100 cash on him just a few hours before his murder, and, after the murder, only $20 was found hidden in a passenger door compartment of his truck).
[12] Although Beasley argues that the purpose of the sequestration rule is to prevent a witness from changing his or her testimony, he does not cite to any record testimony which was changed because the family member witnesses were not sequestered.
[13] See, e.g., Donaldson v. State, 722 So.2d 177, 186 (Fla.1998)(quoting from State v. Dixon, 283 So.2d 1, 9 (Fla.1973), in interpreting the terms "heinous, atrocious, [or] cruel").
[14] Many of the mitigating factors which the trial court found to exist were presented by defense counsel pursuant to section 921.141(6)(h), Florida Statutes, which provides that mitigating circumstances shall include "[t]he existence of any other factors [not enumerated in 921.141(6)(a)-(g)] in the defendant's background that would mitigate against imposition of the death penalty." This amended provision of the death penalty statute was in effect during the penalty phase of Beasley's trial. Prior to the 1996 statutory amendment, these factors could have been considered as nonstatutory mitigators.
[15] The trial court found, and weighed, the following aggravating factors: the murder was committed in the course of a felony robbery (little weight); the murder was committed for financial gain (merged with the felony murder aggravator); and the murder was especially heinous, atrocious, or cruel (very great weight). The court found, and weighed, the following factors as statutory mitigating factors pursuant to section 921.141(6)(h), Florida Statutes: failure to complete college and failed marriage (little weight); good manners and good personality (little weight); good son (little weight); good student, athlete, and active in extracurricular activities in school (little weight); good citizen, military service (some weight); good worker (some weight); good friend (little weight); good brother (little weight); good musician (very little weight); church participation (little weight); mental/neurological damage resulting from alcohol and drug abuse (some weight); suicide of friend (little weight); self-sufficient, self-reliant (little weight); financial responsibility in general (little weight); periodic financial instability due to recurrent substance abuse disorder (little weight); no prior convictions for violent crimes (some weight); maintains contact with children and grandchildren (some weight); alcohol problem for two years following divorce (little weight). No other statutory mitigating factors were found.

The court also found, and weighed, the following nonstatutory mitigating factors: psychological mitigating factors based upon the results of the battery of psychological tests presented at the Spencer hearing which did not, either individually or collectively, rise to the level of extreme mental or emotional disturbance or substantial incapacity so as to reach the level of statutory mitigation (some weight); mitigating factors relating to Beasley's ability to serve a life sentence without difficulty (little weight); and post-incident behavior, including behavior while incarcerated (some weight).