CORTIÑAS, J.
(dissenting).
The majority would reverse the trial court’s adjudication of S.L. on the interference charge, believing that S.L.’s disruptive behavior did not constitute an interference with the lawful administration of his school’s daily functions in violation of section 877.13, Florida Statutes. However, Florida law provides otherwise. Because S.L. intentionally disturbed the lawful administration of his school and caused school administrators and other officials to accelerate their activities and disrupt the school’s schedule, I must respectfully dissent.[6]
*1086 Though the trial court’s denial of S.L.’s motion for judgment of dismissal is reviewed de novo, facts adduced from the evidence are taken as true and “[a]ll reasonable inferences that may be drawn from such evidence must be viewed in a light most favorable to the State.” A.P.R. v. State, 894 So.2d 282, 285 (Fla. 5th DCA 2005) (quoting Espiet v. State, 797 So.2d 598, 601 (Fla. 5th DCA 2001)). Thus, “if a rational trier of fact could find that the elements of the offense have been proven beyond a reasonable doubt, the evidence is sufficient to sustain the conviction and the motion should be denied.” Id. (emphasis added) (citation omitted) (noting that in moving for a judgment of dismissal, the accused “admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the [State] that a [trier of fact] might fairly and reasonably infer from the evidence.”) (quoting Beasley v. State, 774 So.2d 649, 657 (Fla.2000)). In viewing the evidence as true and drawing all reasonable inferences in favor of the State, there is sufficient evidence that the State proved S.L.’s behavior was unlawful under section 877.13, Florida Statutes. Accordingly, there is sufficient evidence to sustain S.L.’s conviction and, thus, the trial court’s denial of S.L.’s motion for judgment of dismissal should be affirmed.
Florida Statutes enumerates behaviors that are considered unlawful when a person interferes with the administration or function of an educational institution. See § 877.13, Fla. Stat. (2010). Specifically, section 877.13(l)(a), provides that “(1) it is unlawful for any person: (a) [k]nowingly to disrupt or interfere with the lawful administration or functions of any educational institution, school board, or activity on school board property in this state.” § 877.13(l)(a), Fla. Stat. This Court has previously addressed the elements necessary to uphold a conviction under section 877.13(l)(a) in a case involving a constitutional, challenge to the statute. See M.C. v. State, 695 So.2d 477 (Fla. 3d DCA 1997).
In upholding the constitutionality of the statute, this Court noted that, “[t]he obvious intent of section 877.13 is to ensure that educational institutions and their administrators are able to perform their lawful functions without undue or unwarranted interference or disruption from others.” Id. at 480. Because the “intended purpose is to prevent only that expression or conduct which materially disrupts or interferes with normal school functions or activities!,]” the prohibited action or conduct should be measured objectively by the impact or effect on the progress of the school’s normalized activities or functions. Id. at 481-84. Though the statute requires that the accused act with culpable intent, “intent is an issue for the trier of fact.” M.M. v. State, 997 So.2d 472, 474 (Fla. 5th DCA 2008). Therefore, Florida courts affirm convictions where there is sufficient evidence to conclude that the accused acted with the intent that his or her behavior temporarily impede the school’s normalized activities or functions on the school’s property, and that such action caused a disruption to the institution. Id. J.J. v. State, 944 So.2d 518 (Fla. 4th DCA 2006); T.J. v. State, 867 So.2d 1238 (Fla. 5th DCA 2004); M.C., 695 So.2d 477.[7]
*1087 Contrary to the majority’s opinion, the case before us contains numerous facts that are similar, if not more egregious, to those in M.C., 695 So.2d 477, which support S.L.’s conviction under the statute. M.C., intending to protest her brother’s arrest, entered the school’s office, hurled obscenities at the arresting officer, and waived her arms as to encourage attention from about five to seven other students that were present. Id. at 479. The State presented evidence that M.C.’s loud tirade temporarily impeded the school’s secretaries’ ability to perform their duties and that the police officer’s arrest of her brother was temporarily halted. Id. at 484. In affirming M.C.’s conviction, this Court held that the school’s normalized activities or functions were disrupted because M.C.’s actions brought the school office’s normal activities to a temporary halt. Id.
Likewise, S.L.’s continuous and disruptive behavior impeded and disrupted his school and his school administrators’ normalized activities and functions. David Jefferson, Dean of Discipline for the Ren-ick Educational Center, was standing at the end of the school’s hallway speaking with Officer Dadd. At the time, several classes of students and school teachers were also in the hallway walking to the school’s cafeteria for their regularly-scheduled lunchtime while other classes were leaving the cafeteria to return to their classrooms. Suddenly and without provocation, S.L., who was standing about twenty-five yards away at the opposite end of the hallway, surrounded by a group of students, began yelling obscenities at Officer Dadd. S.L.’s rant included statements such as, “I can’t stand the Po, Po. F the Po, Po. Po, Po[.] could suck my you know what. I hate the Po Po. You cracker Po[,] Po.”
Officer Dadd first tried walking away from S.L. in an effort to prevent S.L. from causing a further disturbance to the school’s normalized activities, but S.L. continued to yell vulgarities and make obscene gestures while still in the hallway in the presence of other students. S.L.’s behavior caused teachers to quickly usher students into the cafeteria or back inside classrooms in order to get away from the situation in an attempt to prevent S.L.’s disturbance from further escalating. In an attempt to stop S.L.’s disruptive behavior from further impeding on the school’s regular lunchtime activities, Dean Jefferson and Officer Dadd intervened. They stopped S.L. in front of the cafeteria, tried to talk and calm S.L. down, but yet again, S.L. continued to carry on with his unsettling behavior and actions, saying, “I can’t stand the police. I hate police officers. F U you cracker police officer. You Irish piece of crap police officer.”
For a third time, Officer Dadd tried to calm S.L., but still to no avail. After another round of S.L.’s unrelenting rant of obscenities, Officer Dadd thought S.L.’s disturbing actions might cease if S.L. was allowed to go in the cafeteria to eat lunch. However, immediately after S.L. entered, S.L. turned, loudly yelled more obscenities at Officer Dadd, and then took off through the cafeteria in front of the other students. The school’s security guard, Mr. Williams, was forced to stop S.L. for a fourth time *1088 and bring him back to the front of - the cafeteria. Even then, S.L. continued his disturbing antics. Because S.L.’s continuous and unruly behavior, in front of other students, caused a disturbance to the school’s regularly-scheduled lunchtime and classroom activities, Dean Jefferson and Officer Dadd took S.L. to an office where Officer Dadd could “talk to him in a private place where he’s not showing off.” Officer Dadd attempted to calm S.L. for a fifth time, but yet again, S.L. continued with his reckless disregard for the school’s normalized activities with obscene gestures and disrespectful obscenities.
Officer Dadd then explained to S.L. what would happen if S.L. did not calm down and stop his unrelenting and disruptive behavior. But, S.L. refused to cooperate. It was not until then, after making this sixth request to S.L. to stop any further material disruption to the school that Officer Dadd decided to arrest S.L. While in the school’s office, after being handcuffed, S.L. continued his distressing tirade, actions which continued to impede normal school activities as well as disrupt school administrators’ normalized daily functions. S.L.’s disturbance in the school’s office led Officer Dadd to call another officer, Officer Calzadilla, for assistance. Even still, S.L.’s antics continued. Though S.L. was now handcuffed, his behavior continued to disrupt the activities of the school’s office to such a degree that it was decided to take S.L. out of the school and into Officer Calzadilla’s police car.
When S.L. was brought into the hallway outside of the school’s office, S.L.’s disruptive behavior intensified as he began to struggle and loudly curse, which echoed in the enclosed hallway. Once outside, S.L. continued to physically and verbally insult and abuse the police officers in front of the school’s staff. S.L.’s behavior was so out of control that a third, female officer was requested. Even then, S.L. continued his antics, kicking, screaming, yelling, and cursing at the female police officer, calling her a “B.” Officer Dadd, and the two other officers, then placed S.L. outside of the police car on the floor in front of the school. Therefore, the State presented sufficient evidence that S.L.’s behavior disrupted the school’s normalized activities and the school administrators’ functions. See M.C., 695 So.2d 477; see also T.J., 867 So.2d 1288 (holding that student’s behavior constituted the disruption of an educational institution after student’s removal from a classroom for being disruptive and the refusal to calm down, after repeated warnings that included an explanation on what would happen if he did not calm down, in a common area of the school, which interfered with the community assistant’s normalized function to assist other students).
Also, as in M.C., there is sufficient evidence that supports the trial court’s determination that S.L.’s actions were intended to cause a disruption to the school’s function and activity. See also M.M., 997 So.2d at 474. S.L.’s actions first caused a disruption to the school’s activity and the school administrators’ function when, for no reason, he began hurling obscenities at Officer Dadd, knowing that there was a group of students that surrounded him in the hallway. Also, S.L. acted with reckless disregard to the school’s normalized function and activity when he continued his disruptive behavior after seeing teachers and students deviate from their normalized daily schedule of coming and going to the cafeteria because of his actions. In addition, S.L.’s behavior caused a disruption to the school’s students, teachers, and other school staff members’ normalized activity when S.L. entered, turned, loudly yelled obscenities at Officer Dadd, and ran through the cafeteria during the school’s regularly-scheduled lunchtime. Further, after speaking with Dean Jefferson and *1089 Officer Dadd in the front of the cafeteria, S.L.’s behavior continued to disrupt the normalized functions of the school’s administrators when he refused to calm down. Moreover, S.L.’s unruly behavior continued even after he was brought into the school’s office and was told what would happen if he did not calm down, behavior which even continued after officers placed S.L. in the police car. Thus, “[t]his is sufficient to establish a violation of section 877.13.” Id. (affirming conviction where evidence established that “M.M. knew there were other students on the bus as it prepared to leave and that by leaving the bus he disrupted its schedule, as well as the schedule of other buses.”); see also J.J., 944 So.2d 518 (affirming conviction where students were incited to fight after repeated requests to stop, resulting in the cafeteria getting louder, and disrupting school’s breakfast service); T.T. v. State, 865 So.2d 674 (Fla. 4th DCA 2004) (affirming conviction after student who disrupted an awards ceremony refused to leave with an officer).
Furthermore, the majority incorrectly concludes that S.L.’s disruption was not “material,” because it erroneously relies on the fact that S.L.’s school, the Renick Educational Center, is a school for emotionally and behaviorally disturbed children. Thus, the majority mistakenly determined that, because part of the teachers’ functions may have been to assist behaviorally disturbed children, and that they “did a marvelous job” by accelerating normalized lunchtime activities, there was no “material” disturbance. However, this factor has already been addressed by the Fifth District as being non-determinative in analyzing whether a conviction should be upheld under section 877.13. In T.J., 867 So.2d 1238, the Fifth District held that, although part of a teacher’s job responsibility was to assist students with behavioral problems, continued disruptive behavior amounts to an interference with a normalized school function. T.J. was placed outside of his classroom for his disruptive behavior and sent to one of the school’s assistants who helps disruptive students by attempting to return them to class once they have been removed. Id. at 1239-40. The school’s assistant testified that he attempted to calm T.J., but T.J. continued to be disruptive, by cursing and being irate. Id. T.J. also interrupted students who were in proximity to him and prevented the assistant from helping other students. Id. Because the assistant could not stop T.J.’s disruptive behavior, he called the school’s security officer. Id. T.J. failed to comply with the security officer, and was subsequently arrested. Id. The Fifth District upheld T.J.’s conviction, finding his continued disruptive behavior amounted to the disruption of an educational institution’s normalized function. Id. Thus, contrary to the majority’s characterization, even though the Renick teachers may have been trained to work with disturbed students, this factor should not be used to determine whether S.L.’s behavior disrupted the school’s normalized functions.
Here, there was sufficient evidence that S.L. intended to disrupt school activities, and succeeded in doing so. S.L. was repeatedly asked to calm down and stop numerous times, which he did not do. As a result of S.L.’s behavior, the school’s normalized daily lunchtime activities and functions had to be accelerated. Notably, Dean Jefferson testified that, in his experience as a twenty-eight year professional with Miami-Dade Schools, and as the Dean of Discipline at the Renick Educational Institution, S.L.’s actions disrupted normal school functions. And, furthermore, S.L.’s actions interfered and disrupted Officer Dadd’s normalized daily functions as the school’s officer.
*1090 Taking all facts as true and viewed in a light most favorable to the State, the evidence in this case was sufficient for the trial court to conclude that S.L. intended to disrupt or interfere with a school activity or function and succeeded in doing so.
Accordingly, I would affirm the trial court’s denial of S.L.’s motion for judgment of dismissal because there is sufficient evidence to sustain S.L.’s conviction.

. I agree with the majority that, as to the second count, resisting arrest without vio *1086 lence, S.L.’s adjudication should be affirmed.

. The cases cited by the majority are distinguishable insofar as the cases hold that reversal is necessary where there was no evidence presented of an intent to disrupt the institution and that the institution was disrupted. See A.M.P. v. State, 927 So.2d 97 (Fla. 5th DCA 2006) (reversing conviction where there was no evidence of an intent to disrupt the institution, but instead, the evidence was limited to a fight between two high school stu *1087 dents in a bathroom before school started); S.W.W. v. State, 833 So.2d 877 (Fla. 3d DCA 2003) (reversing conviction where there was no evidence that the accused acted to create a disturbance or that he acted with reckless disregard of the effect of his behavior); L.T. v. State, 941 So.2d 551 (Fla. 2d DCA 2006) (reversing conviction where there was no evidence that the accused intended to stop or impede a normal school function, but rather, evidence established that accused joined an already on-going fight with the intent of protecting her sister).