# Supreme Court of Florida

_____

No. SC13-442
_____

**JOEL LEBRON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[December 21, 2017]

PER CURIAM.

As explained below, we affirm Joel Lebron's convictions but vacate his death sentence and remand for a new penalty phase.[1]

## BACKGROUND

On Saturday, April 27, 2002, Ana Maria Angel and Nelson Portobanco, both high school students, decided to go for a walk on the beach in Miami Beach after a dinner date. After walking along the beach for a while, the couple decided to return to their vehicle. By this time, Lebron and his four codefendants (Cesar

---

1. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

Mena, Victor Caraballo, Hector Caraballo, and Jesus Roman) had arrived in an extended cab truck and parked. As Angel and Portobanco left the beach, they were approached by Lebron (who identified himself as Diablo to the couple) and another codefendant and forced at gunpoint to get into the truck.

Once in the truck, Angel and Portobanco were forced to turn over their property including wallets, PIN numbers, cell phones, and jewelry. Lebron and the codefendants used Angel's ATM card to try to withdraw money from a nearby cash machine. Following this attempt, Portobanco's cell phone was used to call codefendant Hector Caraballo's number in the Orlando area.

During the abduction, Portobanco was ordered to kiss Angel, and when he refused, the men punched him in the head until he did so. Then, the men demanded and received Angel's underwear and forced Portobanco onto the floorboard. Thereafter, Lebron and other codefendants took turns orally, vaginally, and anally raping Angel as the driver proceeded northbound on I-95.

Eventually, the driver pulled over to the side of I-95, and Lebron and one of the codefendants ordered Portobanco out of the vehicle. Portobanco was walked over to the side of the highway near the barrier wall, where he was then stabbed repeatedly in the face, neck, and back. He was also kicked repeatedly. Portobanco laid motionless on the ground and pretended to be dead until the stabbings and beatings stopped. Lebron and the codefendant went back to the truck, leaving

Portobanco on the side of the road. Once Lebron and the codefendants drove away, Portobanco was able to walk back to the roadway and stop a passing motorist who reported the crime.

Lebron and his codefendants continued to drive north with Angel in the truck until they reached Palm Beach County, where they once again pulled over to the side of the road. Lebron and another codefendant took Angel out of the vehicle and walked her to the side of a roadway behind a wall concealed from view. Angel was forced to kneel down, where Lebron shot her in the head.

Lebron and his codefendants then drove back to Orlando, where the group stopped so some of the members could buy crack cocaine before dropping two of the codefendants off at an apartment complex.

In the early morning hours of Sunday, April 28, 2002, law enforcement officers interviewed Portobanco in the hospital and learned that the number dialed on Portobanco's cell phone was linked to codefendant Hector Caraballo's apartment in Orlando. Officers, along with FBI agents, went to the leasing office of the apartment looking for Hector. The leasing agent informed them that she did not know of a Hector Caraballo but that Victor Caraballo, another one of the codefendants, had leased an apartment there and moved out while being evicted. The leasing agent gave officers permission to search the apartment and provided them with the keys. Once inside the apartment, the officers found Victor as well as

Angel's ATM card, driver's license, purse, cell phone, and wallet. Portobanco's wallet was also discovered in the apartment. In searching the dumpster near the apartment, the police located Angel's shoes.

Thereafter, two law enforcement officers proceeded to a different apartment complex to look for the truck and a red Honda associated with the crimes. There the police encountered Cesar Mena, who was taken to Florida Department of Law Enforcement (FDLE) headquarters.

During this time, officers identified Jesus Roman and Lebron as additional suspects. Officers located Roman and Lebron at another apartment complex. Lebron was standing in a breezeway with a duffle bag and shopping bags next to him, which were impounded. In one of the bags, a pair of tan boots that appeared to have blood on them was found. These boots belonged to Lebron.

Lebron was arrested on Monday, April 29, 2002, at around 1 a.m. He was not Mirandized when arrested, but officers collected his clothing and glasses to preserve trace evidence. Lebron was then clothed in a gown, handcuffed, and placed in an unmarked vehicle. An officer drove Lebron to the FDLE Regional Center in Orlando.

Once at the FDLE Regional Center, Lebron was placed unhandcuffed in a room with law enforcement officers while other officers went to locate a tape recorder for the interview. However, before Miranda warnings were administered,

Lebron admitted that he shot Angel and stabbed Portobanco. Then, after <u>Miranda</u> warnings were administered and after Lebron waived his <u>Miranda</u> rights, Lebron gave a detailed confession to the murder and sexual assault of Angel and the attempted murder of Portobanco.

Angel's body was found on the shoulder of I-95 behind a thicket of palm trees next to a retaining wall. Her hands were clasped together with their fingers interlaced. She was barefoot and had a number of abrasions on her face and an abrasion on her right leg, which the medical examiner testified were injuries that occurred close to the time of her death. Additionally, officers returned to Mena's apartment, obtained consent, and searched the apartment. Officers located two knives in a closet at the apartment. Officers also found a gun, which a ballistics expert testified was the weapon that killed Angel.

During the guilt phase, law enforcement officers testified regarding Lebron's post-<u>Miranda</u> confession, and the jury heard Portobanco's testimony. Furthermore, a fingerprint examiner testified that there was a fingerprint matching Lebron's found on the mirror of the truck. A forensic biologist and DNA analyst testified that he conducted serological testing on the truck's back seat cover, the boots, and the vaginal and anal swabs from Angel's rape kit and found semen on the seat cover and swabs and blood on the boots. DNA testing revealed a mixture of DNA on the seat cover that was consistent with the DNA of Angel, Lebron, and the

Caraballos, DNA consistent with Lebron on the vaginal swab and anal swab, and DNA consistent with Portobanco on the boots.

After the guilt phase, the jury found Lebron guilty of (1) first-degree murder of Ana Angel; (2) attempted first-degree murder of Nelson Portobanco; (3) armed kidnapping of Ana Angel; (4) armed kidnapping of Nelson Portobanco; (5) armed robbery of Ana Angel; (6) armed robbery of Nelson Portobanco; and (7) armed sexual battery of Ana Angel. And after the penalty phase, the jury voted 9 to 3 to recommend a sentence of death. The trial judge followed the jury's recommendation, finding 6 aggravators and listing numerous mitigating facts.

### GUILT PHASE ISSUES ON APPEAL

Before this Court, Lebron argues: (1) his post-Miranda[2] statement was inadmissible; (2) the trial court erred in denying his motion for mistrial based on Agent Hernandez's statement during testimony; (3) the trial court erred in denying his motion for mistrial based on the State's comment during opening statements; (4) the trial court erred in denying his motion for mistrial based on the presence of the victim's mother in the courtroom; (5) the trial court erred in excluding quantitative electroence-phalography (QEEG) evidence under Frye;[3] (6)

---

2. Miranda v. Arizona, 384 U.S. 436 (1966).

3. Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

the trial court erroneously instructed the jury in such a way as to deprive it of its pardon power; and (7) the trial court erred in denying his motion for mistrial based on the State's demonstration with the handgun during its closing argument. None of these issues warrants relief.[4] We also conclude that the evidence is sufficient to support Lebron's first-degree murder conviction.

## 1. Post-<u>Miranda</u> Statement

First, Lebron argues that his pre-<u>Miranda</u> statement rendered his post-<u>Miranda</u> statement inadmissible and that he did not voluntarily waive his <u>Miranda</u> rights. However, because officers did not engage in a deliberate two-step interrogation strategy calculated to undermine the <u>Miranda</u> warnings and because Lebron was fully informed of and waived his rights, we disagree.

As the lower court explained,

> [Lebron] was located by law enforcement officers in Orlando between 1:00 and 2:00 a.m. on April 29, 2002. [Lebron] was transported to the Orlando headquarters of the Florida Department of Law Enforcement ("FDLE") prior to 2:40 a.m.
> Upon arrival at the FDLE headquarters, [Lebron] was seated in the FDLE cafeteria with an FDLE agent. The agent was aware that no <u>Miranda</u> warnings had yet been administered. Other agents were looking for a tape recorder so that [Lebron's] interview could be recorded if [Lebron] agreed to speak with them.

---

4. Because we are remanding for a new penalty phase pursuant to <u>Hurst</u>, Lebron's other penalty phase claims are moot and are, therefore, not addressed. Additionally, because his individual guilt phase claims do not warrant relief, his cumulative error claim fails. <u>See</u> <u>Johnson v. State</u>, 104 So. 3d 1010, 1029 (Fla. 2012).

The agent initially said nothing to [Lebron]. After several minutes, [Lebron's] demeanor changed and he began to cry. The agent said, "I hope you know what kind of trouble you are in." [Lebron] replied, "Yes, I know. I killed her." He said that he told her to get down on her knees and that the gun did not go off until the third time he pulled the trigger. After [Lebron] said this, the agent left the room to report this information to other agents because up until that moment, the law enforcement agencies had hoped that Ms. Angel was still alive. [Lebron] said nothing further at that time and was not asked any questions.

At 3:06 a.m. the officers had located a tape recorder and began administration of <u>Miranda</u> rights. [Lebron] signed the waiver form at 3:15 a.m. [Lebron] gave a detailed confession which included the abduction of both victims, the theft of the victims' jewelry, credit cards, bank cards, and property, the sexual assault and murder of Ms. Angel, and the attempted murder of Mr. Portobanco.

<u>State v. Lebron</u>, 979 So. 2d 1093, 1094 (Fla. 3d DCA 2008).

"Both the United States and Florida Constitutions provide that persons shall not be 'compelled' to be witnesses against themselves in any criminal matter." <u>Ross v. State</u>, 45 So. 3d 403, 412 (Fla. 2010). "To protect the right against self-incrimination, the [United States] Supreme Court required that any individual held for interrogation must be clearly informed as to his or her rights, including the 'right to remain silent, that any statement he does make may be used as evidence against him, and . . . [the] right to the presence of an attorney, either retained or appointed.' " <u>Id.</u> at 413 (quoting <u>Miranda</u>, 384 U.S. at 444). "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." <u>Miranda</u>, 384 U.S. at 444.

In Oregon v. Elstad, 470 U.S. 298 (1985), the United States Supreme Court addressed a defendant's statement that was made after he waived his Miranda rights but where the defendant had previously made an incriminating statement before the administration of Miranda warnings. The Court held that the post-warning statement was admissible, stating:

> [A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.

Id. at 314; see also Davis v. State, 698 So. 2d 1182, 1189 (Fla. 1997) ("Shortly after confessing in his holding cell, Davis gave a taped statement in which he voluntarily gave the same information contained in his prior statement. . . . This [second] statement was clearly admissible because Davis was fully informed of (and waived) his Miranda rights before the start of the taping session." (citing Elstad, 470 U.S. 298)); Ramirez v. State, 739 So. 2d 568, 574-76 (Fla. 1999) (applying Elstad and explaining that whether a second, postwarning statement was voluntary requires a review of the totality of the circumstances).

Then, in Missouri v. Seibert, 542 U.S. 600 (2004), the United States Supreme Court held that a second, warned statement was inadmissible where law enforcement officers intentionally and thoroughly questioned the defendant

- 9 -

without administering <u>Miranda</u> in order to elicit an unwarned statement that was then used to elicit the second, warned statement. The plurality opinion in <u>Seibert</u>, 542 U.S. at 611-12, stated the following:

> The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as <u>Miranda</u> requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier?

The plurality listed the following "relevant facts that bear on whether <u>Miranda</u> warnings delivered midstream could be effective enough to accomplish their object:"

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

<u>Id.</u> at 615. Justice Kennedy, who provided the necessary fifth vote in <u>Seibert</u>, explained the following in his concurrence:

> The admissibility of postwarning statements should continue to be governed by the principles of <u>Elstad</u> unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the <u>Miranda</u> warning and of the <u>Miranda</u> waiver. For example, a substantial break in time and circumstances between the prewarning statement and the

> *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient.

*Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment) (citations omitted); see also *Ross*, 45 So. 3d at 424 (considering whether law enforcement employed a deliberate two-step interrogation strategy, "whether the police minimized and downplayed the significance of the *Miranda* rights once they were given," as well as "the circumstances surrounding both the warned and unwarned statements including 'the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first' " when determining the admissibility of a second, postwarning statement (quoting *Seibert*, 542 U.S. at 615)).

In this case, the evidence demonstrates that law enforcement did not employ a deliberate two-step interrogation strategy calculated to undermine the effectiveness of *Miranda* warnings. There was only a single statement of "I hope you know what kind of trouble you are in" by the agent with Lebron responding that he had shot Angel and stabbed Portobanco. There was no thorough prewarning interrogation like the one described in *Seibert* that was then used to

- 11 -

elicit a repeated confession after <u>Miranda</u> was administered.  Cf. <u>Seibert</u>, 542 U.S. at 605, 616 (explaining that the defendant in <u>Seibert</u> was questioned for 30 to 40 minutes before <u>Miranda</u> was administered and that the pre-<u>Miranda</u> questioning "was systematic, exhaustive and managed with psychological skill[, and when] the police were finished there was little, if anything, of incriminating potential left unsaid" and that the post-<u>Miranda</u> questioning "was fostered by references back to the confession already given"); <u>see also</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980) ("[T]he special procedural safeguards outlined in <u>Miranda</u> are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation.  'Interrogation,' as conceptualized in the <u>Miranda</u> opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.").

Once the agent informed others that Angel was in fact deceased, <u>Miranda</u> rights were administered, and Lebron knowingly, intelligently, and voluntarily waived his rights.  Specifically, Agent Hidalgo presented Lebron with a <u>Miranda</u> waiver form and read each of the rights to Lebron.  Lebron indicated to Agent Hidalgo that he understood his rights.  Lebron then agreed to speak with the officers without an attorney, and Lebron signed the waiver form.  Officers also testified that Lebron did not appear intoxicated and that he appeared to understand what was occurring.  No threats or promises were made.

Moreover, while Lebron's prewarning statement indicated that he had killed Angel and attempted to kill Portobanco, it did not include the details of his role in the kidnapping, robbery, and sexual battery that he included in his postwarning statement. There is no evidence that law enforcement minimized the significance of the Miranda warnings once they were given. The first statement was not used by law enforcement in eliciting the postwarning statement. Law enforcement did not refer to the first statement when conducting the post-Miranda interview. Instead, law enforcement began questioning Lebron about what had occurred beginning with when Lebron first met with the codefendants. Also, Lebron's initial confession in response to the agent's single statement was made at approximately 2:42 a.m., and the officers did not question him until after he executed a written waiver at 3:15 a.m.

Accordingly, because officers did not engage in a deliberate two-step interrogation strategy and because Lebron knowingly, intelligently, and voluntarily waived his Miranda rights before making his second statement, his postwarning statement was admissible.

### 2. Agent Hernandez's Testimony

Next, Lebron argues that the trial court erred in denying his motion for mistrial based on Agent Hernandez's testimony. An order granting a mistrial is required "only when the error upon which it rests is so prejudicial as to vitiate the

entire trial." Smith v. State, 866 So. 2d 51, 58 (Fla. 2004). In reviewing a trial court's ruling on a motion for mistrial, this Court employs an abuse-of-discretion standard of review. Id. at 58-59.

Lebron argues that he was unfairly prejudiced by Agent Hernandez's testimony that he was able to recall Lebron's confession because this was the worst case he had ever seen. However, the actual testimony during trial was the following:

> In my twenty-five years as a law enforcement officer, I never heard a confession like that when he talked to – to the agent about the – how he and the other rape and did whatever.

This testimony was provided during the State's case in chief following defense counsel's statement in opening argument that he intended to challenge the reliability of testimony regarding Lebron's confession after it was learned by the officers that it had not been recorded.

This Court has long recognized that a party presenting a witness may present evidence on direct examination as "anticipatory rehabilitation." Lawhorne v. State, 500 So. 2d 519, 520 (Fla. 1986); Bell v. State, 491 So. 2d 537, 538 (Fla. 1986). Moreover, when a prior law enforcement witness was under cross-examination earlier in the trial, defense counsel asked extensive questions regarding the detective's ability to remember the details of Lebron's confession. When the trial court indicated that it allowed Agent Hernandez's testimony because it had

anticipated defense counsel's cross-examination on the issue, counsel did not suggest that it did not intend to pursue the line of questioning.

Thus, the trial court did not abuse its discretion in allowing Agent Hernandez to testify as to why he was able to remember the confession.

### 3. Opening Argument

Lebron claims that the trial court erred in denying his motion for mistrial based on the State's comment during opening argument. "This Court reviews a trial court's ruling on a motion for mistrial under an abuse-of-discretion standard of review." Smith, 866 So. 2d at 58-59.

During its opening statement, the State discussed the facts of the crime, how the investigation of the use of the cell phones stolen from the victims led them to Hector's apartment, and how that led to the discovery of Victor and the victims' property in and around the apartment. The prosecutor then stated:

> So at that point, the police had one down, but they had four more to go.
> Now, as this investigation was unfolding, the police are fielding information from a lot of different sources. And one investigative lead that they got took them to another apartment complex. . . . And Special Agent King, the one that had busted in through Victor Caraballo's evicted apartment, goes there along with an FBI agent, because the FBI is also involved in this case.
> And when they go to that apartment complex, they encounter an individual by the name of Cesar Mena. He's the one that I told you was driving the truck the whole time. Cesar Mena is also taken into custody. And at that point, they've got two down, and there are three more to go.

- 15 -

The police continue fielding investigative leads. And now they know that they are looking for two individuals by the names of Jesus Roman and Joel Lebron.

Lebron asserts that this comment violated Postell v. State, 398 So. 2d 851, 854 (Fla. 3d DCA 1981), in which the court held that where "the inescapable inference from the testimony is that a nontestifying witness has furnished the police with evidence of the defendant's guilt, the testimony is hearsay, and the defendant's right of confrontation is defeated." (Footnote omitted.) However, as the State notes, this Court has also held that there is no violation where a police officer testifies regarding steps taken during an investigation without identifying anyone the police spoke to or alluding to the conversations that took place. See Evans v. State, 808 So. 2d 92, 103-04 (Fla. 2001). Additionally, this Court has recognized that an officer can testify about the actions taken based on a tip of information received without describing the tip, the information, or its source. See State v. Baird, 572 So. 2d 904 (Fla. 1990).

Here, the statement made by the prosecutor during opening statement did not create an "inescapable inference" that anyone who would not be testifying provided the evidence of Lebron's guilt. Instead, the statement that the police knew to look for Lebron based on information received is similar to testimony regarding the police acting based on information received, which this Court has stated can be proper. See Baird, 572 So. 2d at 908 ("[W]hen the only relevance of

- 16 -

such a statement is to show a logical sequence of events leading up to an arrest, the better practice is to allow the officer to state that he acted upon a 'tip' or 'information received.' without going into the details of the accusatory information."). Furthermore, in mentioning that the police had received leads from numerous sources, the State weakened any possible inference that this information had been received by a nontestifying witness.

Accordingly, the trial court did not abuse its discretion in denying the motion for mistrial.

### 4. Angel's Mother

Additionally, Lebron asserts that the trial court erred in denying his motion for mistrial based on the presence of Margarita Osorio, Angel's mother, in the courtroom. Particularly, Lebron argues that he was prejudiced by the emotional reactions of Angel's mother when the State gestured toward her during closing arguments. We disagree.

This Court reviews a trial court's ruling on whether a witness can be present in the courtroom under an abuse of discretion standard. See Gore v. State, 599 So. 2d 978, 986 (Fla. 1992). And the next of kin of homicide victims have a constitutional right to be present at all stages of criminal proceedings. See art. I, § 16(b), Fla. Const. This right has been codified in section 90.616(2)(d), Florida Statutes (2017), which provides that the victim's next of kin are excluded from the

rule prohibiting a witness from hearing the testimony of other witnesses unless there is a showing that the presence of the next of kin will be prejudicial. In determining whether prejudice has been shown, this Court considers whether the relative testified regarding a material issue and the witness's presence provided an opportunity to change his or her testimony and whether the relative engaged in overt emotional outbursts during the proceedings. See Beasley v. State, 774 So. 2d 649, 669 (Fla. 2000).

During Lebron's first attempt to have Osorio excluded from the courtroom pursuant to section 90.616, Florida Statutes (2012), he did not argue that her presence in the courtroom would be prejudicial because she would testify to a material issue or had displayed an emotional outburst. Lebron actually conceded that Osorio's testimony would be limited to issues that were not in genuine dispute. During trial, Osorio testified regarding the clothing Angel was wearing on the night of the murder, that she saw Angel leave with Portobanco, and that she saw Portobanco in the hospital after the crimes. Lebron also never made a contemporaneous objection to any show of emotion from Osorio. Instead, the record reflects that the trial court noted that Osorio had been very composed. Lebron even acknowledged that Osorio had not engaged in any emotional outbursts that disrupted the proceedings and only claimed to have seen her crying.

Accordingly, Lebron fails to demonstrate the prejudice necessary to overcome Osorio's constitutional and statutory right to be present. We affirm the denial of the motion for mistrial based on her presence.

**5. QEEG Evidence**

Lebron claims that the trial court erred in excluding QEEG evidence to support Lebron's argument that he suffered from a traumatic brain injury. However, we affirm the trial court's exclusion of this evidence.

The standard of review of a <u>Frye</u> issue is de novo. <u>See</u> <u>Hadden v. State</u>, 690 So. 2d 573, 579 (Fla. 1997). Under <u>Frye</u>, "[t]he proponent of the evidence bears the burden of establishing by a preponderance of the evidence the general acceptance of the underlying scientific principles and methodology." <u>Castillo v. E.I. Du Pont de Nemours & Co.</u>, 854 So. 2d 1264, 1268 (Fla. 2003).

At the <u>Frye</u> hearing, Dr. William Lambos, a neuropsychologist, testified about peer-reviewed studies that utilize QEEG as having been used in comparing individuals to normative databases. He testified that the software used, NeuroGuide, had been used since 2005. He went on to state that the software has been registered with the federal Food and Drug Administration, and this registration establishes the appropriateness of the NeuroGuide analysis "to be used by qualified medical or clinical professionals for the statistical evaluation of human electroencephalogram or EEG." Dr. Lambos also identified a 400-page abstract of

795 peer-reviewed journal articles on LORETA, another software program utilized in the QEEG study. Several of those articles, between 130 and 150 of which Dr. Lambos read, supported his subfield which is "[t]he use of QEEG to identify disregulations of the brain that impact behavioral functioning or behavioral health issues."

Lebron contends that the weight of this evidence at the Frye hearing established the general acceptance in the scientific community of the QEEG study protocol. However, while Dr. Lambos identified one article regarding the use of normative databases in analyzing QEEG and identified numerous abstracts of articles concerning LORETA, he admitted that he had read 20% of the articles whose abstracts he identified and did not claim that any of them concerned using QEEG as a means of diagnosing brain damage. Further, other evidence at the hearing showed that while there were numerous articles that had been published regarding QEEG use, most of them concerned uses other than diagnosing brain damage. Additionally, while Lebron argues that the fact a QEEG has been registered with the FDA shows that it is a generally accepted means of diagnosing brain damage, Dr. Lambos acknowledged that such registration did not suggest approval of QEEG.

Dr. Lambos also admitted that he had generated $1 million in gross income by conducting QEEG tests and that he had begun using QEEG in forensic work to

increase its acceptance and generate more income from it. Moreover, while Dr. Lambos admitted that his results were based on using information from a database, he testified that did not know anything regarding the creation of the database.

Two other witnesses that testified at the hearing, and stated that QEEG was not generally accepted as a means of diagnosing brain damage. Dr. Lambos also admitted that it was not proper to diagnose brain damage based on QEEG data. Further, there was testimony that pictures produced by LORETA from QEEG data were misleading because they colored large areas as if the entire area of a brain was damaged even though the data only supported a conclusion that there was damage somewhere in that area.

Given the above, Lebron failed to carry his burden of proving that QEEG evidence was a reliable and generally accepted means of diagnosing brain damage. Dr. Lambos, who testified that he conducted QEEG tests to generate income, is not the type of impartial expert needed to show the general acceptance of QEEG. See generally Ramirez v. State, 810 So. 2d 836, 851 (Fla. 2001). Additionally, Dr. Lambos did not know anything about the creation of the database. See Murray v. State, 692 So. 2d 157, 163-64 (Fla. 1997) (evidence not admissible when based on testimony from an expert who has no knowledge of how the database was assembled and used).

Accordingly, testimony based on the use of the database was properly excluded.

### 6. Pardon Power

Lebron also asserts that one of the trial court's instructions deprived the jury of its pardon power. In support of his argument, Lebron relies on the hypothetical set forth by the trial judge during voir dire. During voir dire, the judge presented an example of a mother of a hungry child who "goes to Publix . . . takes a loaf of bread off of the shelf and she walks out of the store without paying for it." The court also informed the jury that it could not return a not guilty verdict if the State had proven its case beyond a reasonable doubt, no matter what the circumstances. The jury instructions also included the following statement:

> There are some general rules that apply to your discussions. You must follow these rules in order to come to a lawful verdict. You must follow the law as it is set out in these instructions. If you fail to follow the law, your verdict will be a miscarriage of justice. There is no reason for failing to follow the law in this case.

These instructions, according to Lebron, deprived the jury of its pardon power.

This issue is unpreserved and meritless. First, Lebron did not object to the trial court's instructions during voir dire. To preserve an issue, a defendant must make a contemporaneous objection on the specific grounds raised on appeal. See F.B. v. State, 852 So. 2d 226, 229 (Fla. 2003). As the trial court provided its hypothetical of the mother and hungry child, Lebron did not object. Additionally,

- 22 -

when Lebron objected while the trial court discussed a veniremember's answer, Lebron only raised a general objection without stating the grounds. After the trial court had completed all questioning, taken a recess, and discussed other matters with the State, Lebron informed the trial court that the basis of the objection had been denial of the jury's pardon power. The trial court did not rule on the issue. Instead, the court asked Lebron for legal support of the argument, to which Lebron provided none. Thus, this issue is not preserved for review. See Rose v. State, 787 So. 2d 786, 797 (Fla. 2001) ("As a general rule, the failure of a party to get a timely ruling by a trial court constitutes a waiver of the matter for appellate purposes.").

Further, it is not error to instruct the jury to follow the law. Therefore, the trial court did not err in instructing the jury that it had to follow the law in determining Lebron's guilt.

### 7. Handgun

Lebron further asserts that the trial court erred in denying his motion for mistrial based on the State's use of the handgun during closing statements. Lebron argues that the State made an improper golden rule argument when it dry fired the handgun used during the crime three times during closing argument. However, we affirm the trial court's denial of the motion for mistrial.[5]

---

5. As previously mentioned, "[t]his Court reviews a trial court's ruling on a motion for mistrial under an abuse-of-discretion standard of review." Smith, 866 So. 2d at 58-59.

This Court prohibits golden rule arguments, which "invite the jurors to place themselves in the victims' position and 'imagine the victim's final pain, terror, and defenselessness.'" Merck v. State, 975 So. 2d 1054, 1062 (Fla. 2007) (quoting Bertolotti v. State, 476 So. 2d 130, 133 (Fla. 1985)). However, this Court has held that it is not improper for a trial court to allow the State to demonstrate the circumstances of a murder as long as the demonstration is an accurate and reasonable reproduction of what occurred based on the evidence. See Brooks v. State, 175 So. 3d 204, 239-40 (Fla. 2015).

This case is similar to Bailey v. State, 998 So. 2d 545, 555 (Fla. 2008), in which the prosecutor made the following statement during closing arguments:

> I ask that as you sit down in the jury room to deliberate you do two things before you reach the time to take a vote. I want you to all just to put your finger 18 to 24 inches away from each other's face and see how close you are when your eyes are meeting, as his met those eyes on an Easter night in our community and in 18 to 24 inches away firing once, twice, and three times.

There, this Court did not find the comments improper, instead finding that they were "designed to help the jury to visualize the distance between the gun and the victim." Id.

Likewise, it appears that the State, in its use of the handgun, attempted to describe what occurred in order to allow the jury to visualize the evidence. The

demonstration was also an accurate and reasonable demonstration of the events that occurred based on Lebron's confession. Therefore, the comments and demonstration were not improper.

Accordingly, the trial court did not abuse its discretion in denying the motion for mistrial.

### 8. Sufficiency

In death penalty cases, regardless of whether the appellant raises the issue, this Court conducts an independent review to determine whether sufficient evidence exists to support a first-degree murder conviction. See Phillips v. State, 39 So. 3d 296, 308 (Fla. 2010). The evidence in a capital case is judged to be sufficient when it is both competent and substantial. Id. In conducting its review, this Court "view[s] the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006).

In this case, Lebron was charged with, and the jury was instructed on, both first-degree premeditated murder and first-degree felony murder. The jury then returned a general verdict of guilty of first-degree murder. "A general guilty verdict rendered by a jury instructed on both first-degree murder alternatives may

be upheld on appeal where the evidence is sufficient to establish either felony murder or premeditation." Crain v. State, 894 So. 2d 59, 73 (Fla. 2004).

There was competent and substantial evidence in support of both forms of first-degree murder. First, Lebron provided a detailed description of the murder, kidnapping, robbery, and sexual battery in his confession. Lebron described how he and the other codefendants were in the area that night looking for people to rob when they saw Angel and Portobanco walking up from the beach. Lebron explained that he and another codefendant forced them into the truck at gunpoint, stole their belongings, and forced Angel to engage in various sex acts against her will. Lebron then went on to confess that he ordered Angel to get on her knees, pointed the gun at her head, and fired the gun twice before it went off the third time. He also confessed that he shot Angel because he thought she would be able to identify him.

Lebron's confession was corroborated by witness testimony and physical evidence. Portobanco testified that he and Angel were kidnapped and robbed at gunpoint and that Angel was raped. The medical examiner testified that Angel died from a gunshot wound to the head and that the wound was consistent with the gun being less than 12 inches from the head when fired. The crime laboratory manager tested the projectiles recovered from Angel's body and compared them to the bullets shot from the subject pistol. He testified that the bullet that killed Angel

was fired from the handgun found in the codefendants' possession. Lebron's fingerprints were removed from the truck involved in the crime and his DNA was found on the backseat. Further, Lebron's DNA was found on rectal and vaginal swabs of the victim. Lebron's boots also had Portobanco's blood on them.

Accordingly, the evidence presented in this case was sufficient to support a conviction for both first-degree premeditated murder and first-degree felony murder.

## HURST

Finally, we consider whether Lebron is entitled to relief after the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016). Because the jury recommended the death penalty by a vote of nine to three, we conclude that Lebron's death sentences violates Hurst. See Kopsho v. State, 209 So. 3d 568, 570 (Fla. 2017). We must then consider whether the Hurst error was harmless beyond a reasonable doubt:

> The harmless error test, as set forth in Chapman[v. California, 386 U.S. 18 (1967),] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.

Hurst v. State, 202 So. 3d 40, 68 (Fla. 2016) (quoting State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986)), cert. denied, 137 S. Ct. 2161 (2017).

Because the jury in this case recommended death by a vote of 9 to 3, "we cannot determine that the jury unanimously found that the aggravators outweighed the mitigation." Kopsho, 209 So. 3d at 570. "We can only determine that the jury did not unanimously recommend a sentence of death." Id. Therefore, because we cannot say that there is no possibility that the error did not contribute to the sentence, the error in Lebron's sentencing was not harmless beyond a reasonable doubt.

Accordingly, we vacate the death sentence and remand for a new penalty phase. See Hurst, 202 So. 3d at 69.

**CONCLUSION**

For the reasons expressed above, we affirm Lebron's convictions, but we vacate his death sentence and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., concurs.
LEWIS, J., concurs in result.
LAWSON, J., concurs specially with an opinion.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.
CANADY and POLSTON, JJ., concur as to the conviction and dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., concurring specially.

I fully concur as to all issues addressed in the majority opinion except for the

decision to grant relief pursuant to <u>Hurst v. State</u>, 202 So. 3d 40, 68 (Fla. 2016), <u>cert. denied</u>, 137 S. Ct. 2161 (2017). As to that issue, I specially concur. <u>See</u> <u>Okafor v. State</u>, 225 So. 3d 768, 775-76 (Fla. 2017) (Lawson, J., concurring specially).

PARIENTE, J., concurring in part and dissenting in part.

I concur in the reversal of the penalty phase under <u>Hurst v. State</u> (<u>Hurst</u>), 202 So. 3d 40 (Fla. 2016), <u>cert. denied</u>, 137 S. Ct. 2161 (2017). However, I dissent from the majority's decision to affirm Lebron's conviction because Lebron's second confession should have been suppressed based on our precedent in <u>Ross v. State</u>, 45 So. 3d 403 (Fla. 2010). Arrested two hours earlier, stripped of his clothing and eyeglasses, Lebron made a full confession before <u>Miranda</u>[6] warnings were administered. Nothing in the circumstances surrounding the delayed administration of <u>Miranda</u> warnings allowed Lebron to make an informed choice as to his waiver that would render the post-<u>Miranda</u> confession admissible. Thus, I would reverse and remand for a new guilt phase.

Before <u>Miranda</u> warnings were administered and over two hours after arresting Lebron, Detective Hidalgo stated to Lebron at the Florida Department of Law Enforcement (FDLE) Headquarters, "I hope you know what kind of trouble you are in." In response to Hidalgo's statement, as the trial court stated, Lebron

_____

6. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

"provided a full confession detailing his involvement in the crime." Specifically, Detective Hidalgo explained at the evidentiary hearing:

> [Q]: What happened once Joel Lebron started crying?
> [Detective Hidalgo]: He looked down and at that point, I basically told him that he—that I hoped that he knew what kind of trouble he was in.
> . . . .
> At that point, he replied, "Yes, I know," and "I killed her." He didn't go into saying: I killed her and we left her somewhere around I-95.
> He said that he told her to get down on her knees and he—that he would have pulled the trigger twice and the gun did not go off until the third time he pulled the trigger.

There is no question, and the State raises no issue on cross-appeal, that Lebron's first confession violated <u>Miranda</u> and was, therefore, properly suppressed by the trial court. That suppression was affirmed by the Third District Court of Appeal. <u>State v. Lebron</u>, 979 So. 2d 1093, 1097 (Fla. 3d DCA 2008). The majority, however, misses the significance of the circumstances surrounding Lebron's first confession in analyzing whether Lebron's second, post-<u>Miranda</u> confession was properly suppressed by the trial court.

This Court made clear in <u>Ross</u> "that the analysis of the admissibility of statements made following a custodial interrogation and after the delayed administration of <u>Miranda</u> warnings is based on the totality of the circumstances," which should be assessed in light of the following factors:

> (1) whether the police used improper and deliberate tactics in delaying the administration of the <u>Miranda</u> warnings in order to obtain the

- 30 -

initial statement; (2) whether the police minimized and downplayed the significance of the Miranda rights once they were given; and (3) the circumstances surrounding both the warned and unwarned statements including "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." In addition, there are other circumstances to consider on a case-by-case basis, such as the suspect's age, experience, intelligence, and language proficiency.

Id. at 424 (alteration in original) (footnotes omitted) (quoting Missouri v. Seibert,

542 U.S. 600, 615 (2004) (plurality opinion)). As the United States Supreme Court

explained in Seibert:

[I]t would be absurd to think that mere recitation of the litany suffices to satisfy Miranda in every conceivable circumstance. . . . The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as Miranda requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with Miranda, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

542 U.S. at 611-12 (plurality opinion) (emphasis added).

## I. Facts and Background

As the majority explains, Lebron was arrested around 1 a.m. by Detective Hidalgo, an agent for the FDLE. Majority op. at 4. Officers handcuffed Lebron and stripped him of his clothing, including his underwear, glasses, and shoes. Majority op. at 4. Detective Marrero, lead investigator for the case from Miami Beach Police Department, testified at trial:

> Q: So while Mr. Lebron is in the parking lot and while there are dozens of police cars, police personnel, police dogs, helicopters, Mr. Lebron is stripped naked; is that right?
> A: That's correct.
> Q: Every stitch of his clothes—clothing, including his glasses, are taken from him?
> . . . .
> Q: Is that right?
> A: That's correct.
> . . . .
> Q: Now, after Mr. Lebron's clothing was taken from him and . . . after he had—had to strip naked in the parking lot there, he was given basically what is—amounts to a paper bag to put on. . . .
> A: Like a gown.

Despite informing Lebron that he was under arrest, officers did not inform Lebron of his constitutional rights, as required by <u>Miranda</u>. Lebron was clothed in a gown and "booties" and transported by Deputy Sarabia of Orange County Sherriff's Office to FDLE Headquarters in Orlando for interrogation.

At FDLE Headquarters, Lebron—handcuffed, without his glasses, and wearing what Detective Marrero called "a like biohazard outfit" that was "very similar to paper"—was seated in a detective's office guarded by a police officer.

- 32 -

<u>See</u> majority op. at 7.  At this point, according to Detective Marrero, "[e]verything [Lebron] had" was taken from him; he had "nothing in his possession."

## A.  Pre-<u>Miranda</u> Confession

Detective Hidalgo remained with Lebron while others went to locate a tape recorder "so that the defendant's interview could be recorded if the defendant agreed to speak with them."  <u>Lebron</u>, 979 So. 2d at 1094.  While awaiting the tape recorder, Lebron started to cry.  At this point, Detective Hidalgo said to Lebron: "I hope you know what kind of trouble you are in."  Majority op. at 11.  In response, Lebron confessed to killing the victim, including, as stated previously, that he was the one who shot the victim after pulling the trigger three times.

Detective Hidalgo testified at the evidentiary hearing on Lebron's motion to suppress that he made this statement with the express expectation that Lebron would respond.  Specifically, Detective Hidalgo testified:

> Q:   Well, when he began to cry, you turned to him and you made a statement to him?
> A:  Yes, sir.
> . . . .
> Q:  When you said it to him . . . did you have any expectation that he factually might respond to that statement from you?
> A:  Yes.
> Q:  Despite the fact that you had an expectation that he might respond to that statement, you did not advise him of his <u>Miranda</u> rights.
> Correct?
> A:  Correct.
> Q:  And as you had hoped, Mr. Lebron actually did respond to your statement to him.

- 33 -

Correct?

A: Correct.

Q: And his response was in effect a complete confession not only to the fact that the crime had occurred but that he had been the person to commit this crime principally?

A: Correct.

. . . .

Q: And in fact, he admitted to you that he had pulled the trigger twice and then a third time because it had not gone off the first two times.

Correct?

A: Yes. Correct.

After hearing Lebron's confession, Detective Hidalgo went and told Detective Marrero and Lance Newman, Chief of Investigations, that Lebron had confessed and the victim was dead.

The trial court concluded that Detective Hidalgo engaged in the "functional equivalent of interrogation," and, therefore, the confession violated Miranda. The Third District Court of Appeal agreed with that conclusion. Id. at 1094. Despite the majority's conclusion that "there was no thorough pre-warning interrogation," majority op. at 12, it is the law of the case that Lebron's first confession violated Miranda.

## B. Post-Miranda Confession

Around 3 a.m., after Lebron's first confession, Detective Marrero entered the room where Lebron had been seated for approximately two hours. At this point, "officers had located a tape recorder and began administration of Miranda

- 34 -

rights." Lebron, 979 So. 2d at 1094.[7]  Detective Hidalgo administered Miranda

warnings by reading in Spanish FDLE's Miranda consent form.  See majority op.

at 12.  As Detective Hidalgo read, Lebron initialed next to each constitutional

right, indicating his waiver.  Majority op. at 12.[8]  At this point, it was

approximately 3:15 a.m.  Majority op. at 13.  The second interrogation followed,

lasting between sixty and ninety minutes, wherein Lebron again confessed to the

murder.

The trial court suppressed this second confession after analyzing the factors

set forth in Seibert, concluding "that the pre-Miranda question rendered the post-

Miranda statement inadmissible."  Lebron, 979 So. 2d at 1094.  Upon review, the

Third District reversed, concluding that the second confession should not have

been suppressed because Miranda warnings were provided.  Id. at 1097.  For the

reasons explained below, I conclude that the trial court properly suppressed

Lebron's post-Miranda confession.

_____

7.  It is important to note, however, that the tape recorder ultimately did not record Lebron's interrogation.  Majority op. at 14.  According to Detective Ed Royal, lead investigator on the case for FDLE, the tapes were "blank.  Nothing had recorded."  Officers did not learn of this until two weeks after Lebron's questioning.  Thus, there is no recording or transcript of Lebron's post-Miranda confession; the substance of Lebron's confession was recreated based on officers' memory.

8.  Detective Marrero, who ultimately questioned Lebron, testified that Detective Hidalgo administered Miranda warnings because Detective Hidalgo "reads better Spanish."

- 35 -

## II. Analysis

"The State bears the burden of showing that 'the confession was not compelled, but was voluntarily made.' " Ross, 45 So. 3d at 418 (quoting Ramirez v. State, 739 So. 2d 568, 573 (Fla. 1999)). "Further, where a confession is obtained after the administration of Miranda warnings, 'the State bears a "heavy burden" to demonstrate that the defendant knowingly and intelligently waived his or her privilege against self-incrimination and the right to counsel.' " Id. (quoting Ramirez, 739 So. 2d at 575). I turn now to address the facts surrounding Lebron's second confession within the Ross framework.

### Improper and Deliberate Delay of Miranda Warnings

"First, we review whether the police used improper and deliberate tactics in delaying the administration of the Miranda warnings in order to obtain the initial statement." Id. at 424. Although the officers' actions in this case do not rise to the level of a "question first and warn later" technique of interrogation as in Ross, it is clear that the officers deliberately delayed administering Miranda warnings to Lebron without explanation. Id. at 423. In fact, the trial court found that the officers' delay in administering Miranda warnings was not in good faith. This is especially concerning in light of the officers' significant experience in law enforcement and Detective Hidalgo's admission that he expected his statement to Lebron, which he made knowing that Miranda warnings had not been

administered—"I hope you know how much trouble you're in"—to elicit a response from Lebron.

In fact, officers who questioned Lebron demonstrated knowledge of how to properly administer <u>Miranda</u> warnings earlier that night in questioning Victor Caraballo—first in an apartment around 4 p.m., then later that evening at FDLE Headquarters after Caraballo's arrest. In both instances, officers administered <u>Miranda</u> warnings to Caraballo.

### Minimizing and Downplaying the Significance of <u>Miranda</u> Rights

"We next review whether the police minimized and downplayed the significance of the <u>Miranda</u> rights once they were given," a <u>Ross</u> factor that the majority completely ignores. <u>Id.</u> at 428. As this Court explained in <u>Ross</u>:

> This factor is important to ensure that a suspect who is provided with a tardy administration of the <u>Miranda</u> warnings truly understands the importance and the effect of the <u>Miranda</u> warnings in light of the problems faced when warnings are delivered midstream. While a "careful and thorough administration of <u>Miranda</u> warnings serves to cure the condition that made an unwarned statement inadmissible," <u>Davis</u>[ v. State], 859 So. 2d [465,] 471 [(Fla. 2003)], where police minimize and downplay the significance of the warnings, the very purpose of <u>Miranda</u> is undermined.

<u>Id.</u>

Lebron gave a full confession before <u>Miranda</u> rights were administered. Yet, the officers merely gave a perfunctory reading of <u>Miranda</u> before asking Lebron to waive his constitutional rights. Consistent with <u>Seibert</u>, 542 U.S. at 616,

the trial court found that the officers "said nothing to counter the probable misimpression that the advice that anything [the defendant] said could be used against [him] also applied to the details of the inculpatory statement previously elicited." Seibert, 542 U.S. at 616.

Exacerbating this concern, officers did not return Lebron's glasses before administering Miranda. Thus, Lebron was without his glasses as he "follow[ed] along" with Detective Hidalgo and was, again, without his glasses when officers asked him to sign that he had "read," "understood," and waived his rights. Had officers returned his glasses to ensure Lebron could read and understand the form, perhaps the rights would have been perceived as more significant to Lebron. Thus, it is clear that officers minimized and downplayed the significance of the Miranda warnings and rights they protect such that the warnings functioned merely as a formality between the first and second confession.

### Circumstances Surrounding Both Statements

Finally, we must review the circumstances surrounding both statements. See Ross, 45 So. 3d at 432. First, officers obtained a full confession from Lebron before administering Miranda warnings. As Detective Hidalgo testified, Lebron's pre-Miranda confession admitted to each element of the crimes in this case. Thus, the circuit court concluded that officers did not "provide Miranda warnings until after Mr. Lebron had fully confessed to his involvement in the crime." At that

point, without additional clarification or emphasis from the officers on the importance of the <u>Miranda</u> warnings, it is difficult to determine how "the warnings could function 'effectively' as <u>Miranda</u> requires." <u>Seibert</u>, 542 U.S. at 611-12.

The record indicates no significant delay between Lebron's first confession and the beginning of the second interrogation. As the trial court found, "the warned phase took place in the exact same location as the unwarned phase and proceeded after a pause of only 30 minutes"—which included officers discussing the confession and setting up for the second interrogation. In fact, Lebron was still crying from his first confession while he was signing the <u>Miranda</u> waiver form at the beginning of the second interrogation. Thus, it is clear that officers did not separate the first and second interrogations, both of which elicited confessions.

Likewise, the content of Lebron's two confessions obviously overlaps. While Lebron gave additional details in his second confession, the first confession was complete as it gave officers everything they needed to convict Lebron of murder. As the trial court found, "after the police finished receiving Mr. Lebron's un-warned statement there was little, if anything, of incriminating potential left unsaid." In his second confession, Lebron reasonably could have thought he was simply completing the story he began in the first confession, and the officers' questions did not counteract that impression.

Although Detective Marerro did not reference Lebron's pre-Miranda confession in the second interrogation, Detective Marrero asked Lebron what happened, essentially asking Lebron to repeat himself after waiving Miranda. As this Court found in Ross, the officers' interactions with Lebron "w[ere] nothing more than one continuous round of interrogation with no meaningful break." 45 So. 3d at 432. Indeed, the trial court determined that "[t]he impression that the further questioning was a mere continuation of the statements would have been reasonable to regard the two sessions as parts of a continuum [sic], in which it would have been unnatural to refuse to repeat at the second stage what had been said before." Clearly, the second interrogation was anything but "a new and distinct experience" from the first. Seibert, 542 U.S. at 615 (discussing the facts in Elstad, 470 U.S. 298). Thus, I agree with the trial court that it is unreasonable "to find that the warnings effectively advised Mr. Lebron that he had a real choice in providing a statement or stop talking even if he had already provided a statement." Accordingly, Lebron's second confession was involuntary and, therefore, should have been suppressed at trial.

**CONCLUSION**

As this Court stated in Ross, "courts must remain vigilant regarding whether a defendant was given an actual choice in order to guard against the potential danger of violating a defendant's constitutional right against self-incrimination."

- 40 -

45 So. 3d at 419. Not only did officers in this case delay administering <u>Miranda</u> warnings to Lebron, but they also failed to distinguish between the first and second interrogation. As the United States Supreme Court concluded in <u>Seibert</u>, "[t]hese circumstances must be seen as challenging the comprehensibility and efficacy of the <u>Miranda</u> warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that [he] retained a choice about continuing to talk." 542 U.S. at 617.

There is no question that Lebron's second confession was an important part of the State's case and, thus, its admission at trial certainly cannot be considered harmless beyond a reasonable doubt. Therefore, I would reverse and remand for a new trial.

QUINCE, J., concurs.

An Appeal from the Circuit Court in and for Dade County,
William Lewis Thomas, Judge - Case No. 132002CF012509A000XX

Eugene Zenobi, Regional Counsel, Philip L. Reizenstein, Assistant Regional Counsel, and Roy D. Wasson, Office of Criminal Conflict and Civil Regional Counsel, Third District, Miami, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Stephen D. Ake, Senior Assistant Attorney General, Tampa, Florida,

for Appellee